Thomas H. Bienert, Jr., SBN 135311
James D. Riddet, SBN 39826
Whitney Z. Bernstein, SBN 304917
**BIENERT | KATZMAN PC**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
Email: tbienert@bienertkatzman.com
       jriddet@bienertkatzman.com
       wbernstein@bienertkatzman.com

*Attorneys for Mohammed Abdul Qayyum*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MOHAMMED ABDUL QAYYUM,<br><br>Defendant. | Case No. 18-CR-04683-GPC-3<br><br>Hon. Gonzalo P. Curiel<br>Date: June 26, 2019<br>Time: 2:30 p.m.<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS STATEMENT AND HOLD AN EVIDENTIARY HEARING** |

**TABLE OF CONTENTS**

I. INTRODUCTION. .................................................................................................. 1

II. STATEMENT OF FACTS. ..................................................................................... 1

III. MR. QAYYUM'S STATEMENTS SHOULD BE SUPPRESSED BECAUSE THEY WERE TAKEN IN VIOLATION OF *MIRANDA* AND BECAUSE THEY WERE INVOLUNTARY. ............................................................................ 4

    A. This Court should suppress Mr. Qayyum's statements because they were taken in violation of *Miranda*. ............................................................................. 4

        1. Mr. Qayyum was in custody at the time of his questioning. .................... 5

        2. Mr. Qayyum statements were made in response to the agent's interrogation. ............................................................................................. 7

    B. This Court should suppress Mr. Qayyum's statements as involuntary. ............... 8

    C. This Court should hold an evidentiary hearing. ................................................. 10

IV. CONCLUSION ..................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Blackburn v. Alabama,* 361 U.S. 199 (1960)……………………………………….…………8

*Bram v. United States,* 168 U.S. 532 (1897)……………………………………………..…….8

*California v. Beheler,* 463 U.S. 1121 (1983)……………………………………………………5

*Colorado v. Connelly,* 479 U.S. 157 (1986)………………………………………….....……..8

*Haynes v. Washington,* 373 U.S. 503 (1963)……………………………………………..…....8

*Hutto v. Ross,* 429 U.S. 28 (1976)……………………………………………………….…….8

*Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)…………………………...……………..……...8

*Lego v. Twomey*, 404 U.S. 477 (1972)………………………………………………………...8

*Malloy v. Hogan,* 378 U.S. 1 (1964)………………………………………………………..….8

*Miranda v. Arizona*, 384 U.S. 436 (1966)…………………………………………..……..passim

*Orozco v. Texas*, 394 U.S. 324 (1969)………………………………………………….…...5, 6

*Rhode Island v. Innis*, 100 S. Ct. 1682 (1980)………………………………………………….7

*Stansbury v. California*, 511 U.S. 318 (1994)………………………………………………...5

*Townsend v. Sain*, 372 U.S. 293 (1963)…………………………………………………….....8

*United States v. Basher*, 629 F.3d 1161 (9th Cir. 2011)……………………………………...5

*United States v. Bland,* 908 F.2d 471 (9th Cir. 1990)…………………………….…………..5

*United States v. Blanford*, 2012 WL 235631, 467 F. App'x. 624 (9th Cir. 2012)…………..….6

*United States v. Brobst*, 558 F.3d 982 (9th Cir. 2009)……………………………………….6, 7

*United States v. Chavira*, 614 F.3d 127 (5th Cir. 2010)……………………………………. 7

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008)……………………….…………..6

*United States v. Green*, 541 F.3d 176 (3d Cir. 2008)……………………………………….....7

*United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994)………………………..…....…….9, 10

*United States v. Hernandez*, 476 F.3d 791 (9th Cir. 2007)…………………………………...7

*United States v. Kim*, 292 F.3d 969 (9th Cir. 2002)……………………………………………5

*United States v. LaPierre*, 998 F.2d 1460 (9th Cir. 1993)……………………………………7

*United States v. Miller*, 984 F.2d 1028 (9th Cir. 1993)……………………………...…………..8

*United States v. Montana*, 958 F.2d 516 (2d Cir. 1992)………………………………………...7

*United States v. Prieto-Villa*, 910 F.2d 601 (9th Cir. 1990)……………………...…………….10

*United States v. Rogers*, 659 F.3d 74 (1st Cir. 2011)……………………………………………...5

*United States v. Tingle,* 658 F.2d 1332 (9th Cir. 1981)…………………………………...…8, 9, 10

**Statutes**

18 U.S.C. § 3501(a)……………………………………………………………...…………………10

18 U.S.C. § 3501(b)………………………………………………………………………………....9, 10

I.  **INTRODUCTION.**

Mr. Qayyum's answers to the FBI's interrogation on or about September 9, 2016 should be suppressed under *Miranda* and as involuntary. Mr. Qayyum was interrogated in home, objectively not free to leave, and never given any *Miranda* warnings. Further, the agents' threats and intimidation throughout the interrogation render Mr. Qayyum's alleged statements involuntary and thus inadmissible at trial. Should the government contest this motion, the Court should hold an evidentiary hearing and receive testimony from the agents and any other relevant witnesses to resolve the factual disputes.

II.  **STATEMENT OF FACTS.**[1]

In the early morning of September 9, 2016, FBI Special Agents Charles W. Chabalko IV and Jason Pearson appeared at Mr. Qayyum's apartment building. *See* Declaration of Mr. Qayyum ("Declr.") ¶ 7. The agents did not provide any advance warning of their visit. They approached Mrs. Qayyum, who was in the driveway getting into her car to go to work and demanded to speak with Mr. Qayyum. *Id.* ¶ 6. Mr. Qayyum's wife had never in her life had any contact with law enforcement. Like Mr. Qayyum, she is an Indian citizen and was terrified of the FBI. She acquiesced to the agents and brought them to the front door of the apartment that she shared with Mr. Qayyum. *Id.* ¶¶ 6, 7.

Mr. Qayyum was getting dressed, ironing his shirt, and about to leave for work. *Id.* ¶ 5. His wife let herself back into their home, with the agents behind her and outside of their apartment. *See id.* ¶¶ 6, 7. The agents loudly announced that they were from the FBI and wanted to ask Mr. Qayyum a few questions. *Id.* ¶ 7. He was startled and terrified to see two FBI agents in suits at his door, speaking loudly about needing to talk to him, in front of his neighbors who were also leaving their homes and starting their day. *Id.* ¶ 8. Like his wife, Mr. Qayyum, whose first name is Mohammed Abdul, is of Indian descent; though he had no

---

[1] Unless otherwise noted, this statement of facts is based on the government's discovery. Mr. Qayyum does not accept this statement of facts as his own and reserves the right to take a contrary position at the motion hearing and trial. The facts alleged in this motion are subject to supplementation and modification at the time this motion is heard.

idea why the FBI was there, the sad reality is that he was deeply concerned that his neighbors might think he was being investigated for being a terrorist or religious extremist given the FBI's obvious and loud presence at his door with his wife. *See* Declr. ¶ 8. He did not want them to say anything derogatory or draw any further attention to him or his wife. *Id.* ¶ 10. Mr. Qayyum did not know that he could ask them to leave or refuse to let them "ask him a few questions." *Id.* ¶ 9. He felt that he had no choice but to let the agents inside his apartment. *Id.*

The agents never advised Mr. Qayyum that he was a target of their investigation, that he had the right to refuse to be interviewed, that he had a right to stop the interview, or that he had the right to consult an attorney. *Id.* ¶ 9. Mr. Qayyum had never previously interacted with any law enforcement and did not know that he had any of these rights. *Id.* Had he known, he would not have spoken to the agents. *Id.* ¶ 11.

Once inside, the agents began questioning Mr. Qayyum. *Id.* ¶ 12. One agent was doing most of the initial speaking, and the other agent was taking notes throughout the interview.[2] *Id.* ¶ 13. They asked him if he knew various other people, and then accused him of forging documents and hijacking IP addresses. *Id.* ¶¶ 15(a), (b), (d). The agents told Mr. Qayyum that everyone else also said he had done these things. *Id.* ¶ 15(e). Mr. Qayyum unequivocally denied this. *Id.* ¶ 14. The agents were extremely dismissive of his responses. *Id.* ¶¶ 14, 16. They kept accusing him, telling him to just say that he did it over and over again. *Id.* ¶ 14. They told him that they knew he did it, he can't hide it, they were special agents, not regular cops, and he should just come out and say he did it. *Id.* Mr. Qayyum was panicked and confused; how could the FBI have it so wrong? *Id.* ¶ 19. The agents continued flashing documents in front of him, saying he forged them, and that other people were saying this as well. *Id.* ¶¶ 15(c), (d), (e), 16. Mr. Qayyum became aware of the agent's holstered gun at his side as he kept gesticulating with the documents, and Mr. Qayyum became more fearful. *Id.* ¶¶ 17, 18, 19. The agent repeatedly told Mr. Qayyum that he did this, he fabricated the documents, the FBI

---

[2] In order to acquire all information that would be needed to file this motion, counsel sought informal discovery from the government of all notes taken by agents at this interview. The government asserts that no notes exist.

can prove that he did it. Declr. ¶ 14. The agents' voices and demeanor escalated and got louder and angrier the more Mr. Qayyum denied their allegations. *Id.* ¶¶ 14, 18. The agent referenced his file and said he had five counts of wire fraud in there and he could prove it at any time. *Id.* ¶ 14(f). He told Mr. Qayyum that he was going to go to jail, he could do twenty years, and that he would be separated from his family and his wife. *Id.* ¶¶ 22, 26.

Mr. Qayyum was terrified. The agents hadn't listened to anything he was saying, they kept accusing him of wrongdoing he never committed, they had guns, and he was beginning to believe he was in trouble. *Id.* ¶ 19. He desperately wanted the interrogation to end but did not feel that he was free to get up and leave or that he could ask the agents to leave. *Id.* ¶ 24. He felt that they were offended by him already, and he felt that they had so much power. *Id.* ¶ 23. He didn't want to go to jail, he didn't want to be separated from his family, and he didn't want to be deported. *See id.* ¶¶ 8, 22, 26.

At one point, one of the agents said that they were just trying to help him out, and they could help him with recommendations and by talking to higher authorities if he would cooperate with them. Declr. ¶ 20. Mr. Qayyum thought his best course of action was to appease them, tell them what they seemed to want to hear, try to end the interrogation and get away from them as quickly as possible. *Id.* ¶¶ 23, 24, 25. Mr. Qayyum asked to see the documents. *Id.* ¶ 20. The agent told him not to go in circles, not to think about it, that they were there to help him, just listen to them. *Id.* The agents told him that K.P., the then CEO of the company, was the one who did this. *Id.* ¶ 21. They said they just needed help bringing her down. *Id.* Mr. Qayyum told them they were wrong about her, that there was no way she could have done the things they were accusing her of. *Id.* The agents told him that she makes millions of dollars, that Mr. Qayyum gets no part of that, that she has a big house, that everyone on Mr. Qayyum's team has a big house, and that the agents wouldn't even be talking to him and trying to help him if he himself had a big house. *Id.* Mr. Qayyum didn't understand what this meant and asked them to explain. The agents said that they wouldn't come talk to Mr. Qayyum if he was like the others, and that they know that the others are the ones who really did wrong things and made money off of it. *Id.* ¶ 21. The agents again told Mr. Qayyum

that they could help him if he would help them bring K.P. down.  Declr. ¶ 22, 26.

Mr. Qayyum asked them what that meant.  One agent counted off various things on his hand; he said it wouldn't be anything like James Bond, they would tell Mr. Qayyum what to do.  *Id.* ¶ 26.  Mr. Qayyum said he wasn't sure that he could help them.  *Id.*  The agents responded by threatening him with jail time.  *Id.*  They said he would go away for at least twenty years and would be separated from his family, and that he should just do what they were asking to help himself.  *Id.*  To accelerate the end of the conversation, Mr. Qayyum told them he would help them.  *Id.* ¶ 25.  The agents asked to see Mr. Qayyum's driver's license and for his cell phone number, gave him a business card, and said to be in touch.  *Id.* ¶ 28.

Over two years later, Mr. Qayyum was indicted in this case.

## III. MR. QAYYUM'S STATEMENTS SHOULD BE SUPPRESSED BECAUSE THEY WERE TAKEN IN VIOLATION OF *MIRANDA* AND BECAUSE THEY WERE INVOLUNTARY.

### A. This Court should suppress Mr. Qayyum's statements because they were taken in violation of *Miranda.*

The Supreme Court has held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  The law imposes no substantive duty upon the defendant to make any showing other than that the statement was taken from the defendant during custodial interrogation.  *Id.* at 476.

On September 9, 2016, when FBI appeared at Mr. Qayyum's residence, they did not advise him of his constitutional rights to remain silent and consult an attorney before interrogating him for several hours.  *See* Declr. ¶ 30.  Instead, the agents accused him of crimes, demanded he help them, and made clear that harm would come if he refused.  *See id.* ¶ 27.  For these reasons, and those detailed below, the Court should find that Mr. Qayyum was under custodial interrogation at the time the interrogation and therefore suppress his statements pursuant to *Miranda.*

### 1. Mr. Qayyum was in custody at the time of his questioning.

Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda* at 477; *see Orozco v. Texas*, 394 U.S. 324, 327 (1969). The Court's "initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). The Ninth Circuit has held that a suspect will be found to be in custody if the actions of the interrogating officers and the surrounding circumstances constrained the suspect's freedom of movement in such a way that a reasonable person in that situation would not have felt free to leave. *See United States v. Basher*, 629 F.3d 1161, 1166 (9th Cir. 2011). In determining whether a person is in custody, a reviewing court considers "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (noting that other factors may also be pertinent to the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators).

Once a person is in custody, *Miranda* warnings must be given prior to any interrogation. *Miranda* warnings must advise the defendant of each of his or her "critical" rights. *See United States v. Bland*, 908 F.2d 471, 473-74 (9th Cir. 1990).

An individual does not need to be detained at a police station to be in custody. Even when a formal arrest has not yet occurred, a person may be in custody for *Miranda* purposes if his or her freedom of movement is restrained to "the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). Indeed, courts have found custody in a number of domestic circumstances. *See, e.g., Orozco*, 394 U.S. at 325-26 (*Miranda* warnings required because several officers questioned suspect in his bedroom at 4 a.m.); *United States v. Rogers*, 659 F.3d 74, 77-78 (1st Cir. 2011) (custody at home because defendant was ordered home by military superior and police officers executing search warrant never told him he was

free to leave); *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) ("When law enforcement agents restrain the ability of the suspect to move—particularly through physical restraints and through threats or intimidation—a suspect may reasonably feel he is subject to police domination within his own home and thus not free to leave or terminate the interrogation.").

Mr. Qayyum was in custody at the time of the agent's interrogation. The facts of this case are analogous to those in *United States v. Blanford*, 2012 WL 235631, 467 F. App'x. 624 (9th Cir. 2012) (unpublished). In *Blanford*, the Ninth Circuit found that a defendant was in custody during a 45-minute in-home interview, even though he invited agents into his home, because the agents were armed with guns, advised defendant not to have a lawyer present, and confronted him with substantial evidence of his guilt for fraud in order to stop him from terminating the interview. 467 F. App'x at 625. The Court emphasized that agents outnumbered the defendant and restrained him by threatening criminal charges if he did not cooperate and answer questions, and agents never informed him he was free to leave or terminate the interview. *Id.*

Here, like in *Blanford*, the circumstances would lead a reasonable person to believe he was not at will to terminate the interview. The agent arrived at Mr. Qayyum's apartment in the early morning with no advance warning and interviewed him for several hours. Like in *Blanford*, the agents were wearing suits and were armed, and they outnumbered Mr. Qayyum. Further, during the interview, the agents made numerous aggressive and intimidating statements in which they accused Mr. Qayyum of illegal conduct and informed him that he could go to jail for up to twenty years and would be away from his family. Similar to *Blanford*, the agents repeatedly tried to get Mr. Qayyum to incriminate himself and agree to cooperate with them. In an attempt to get inculpatory information from him, the agents repeatedly told him that he was going to jail. Mr. Qayyum was not told that he could terminate the interview.

In these circumstances, where the atmosphere was dominated by federal agents in control of the interrogation, any objective analysis of the facts must result in a finding that Mr. Qayyum reasonably believed he was confined, and was therefore "in custody" during the course of the extended multi-hour interrogation. *See United States v. Brobst*, 558 F.3d 982, 995-

96 (9th Cir. 2009) (*Miranda* warnings required though defendant was briefly interrogated at home, not handcuffed, and never told that he was under arrest, because armed officers approached defendant saying, "you need to come with me," and defendant was given copy of search warrant and told that child pornography was found in her house).

### 2. Mr. Qayyum statements were made in response to the agent's interrogation.

Once custody is established, the Court must determine if the incriminating statements were made in response to government interrogation. The agents' questions of Mr. Qayyum qualify as an interrogation as they were "reasonably likely to elicit an incriminating response." *See Rhode Island v. Innis*, 100 S. Ct. 1682, 1690 (1980). Interrogation is defined as "express questioning" or its "functional equivalent," meaning any activity by law enforcement officers "reasonably likely to elicit an incriminating response." *Id.* "In determining whether a suspect was being interrogated, the critical inquiry is whether in light of both the context of the questioning and the content of the question, the statements made by the officers were of the sort that the police should know [are] reasonably likely to evoke an incriminating response." *United States v. LaPierre*, 998 F.2d 1460, 1466 (9th Cir. 1993) (internal quotation omitted)

Here, Mr. Qayyum was clearly interrogated. The agents repeatedly tried to get Mr. Qayyum to incriminate himself and agree to cooperate with them. And, in an attempt to get inculpatory information from him, the agents repeatedly told him that he was going to jail. These facts alone constitute interrogation. *See United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992) (functional equivalent of interrogation to tell suspect that any cooperation would be brought to prosecutor's attention); *United States v. Green*, 541 F.3d 176, 187 (3d Cir. 2008) (functional equivalent of interrogation when police showed defendant video depicting defendant engaged in criminal activity); *United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010) (functional equivalent when police asked defendant questions about defendant's immigration status, which they already knew, solely for the purpose of eliciting incriminating information); *United States v. Hernandez*, 476 F.3d 791, 796 (9th Cir. 2007) (functional equivalent when officer asked defendant, "What's this?" when officer thought package contained drugs).

In sum, Mr. Qayyum was subjected to the equivalent of custodial interrogation, and *Miranda* warnings were required be given before any questioning. It is undisputed that *Miranda* warnings were not given, so Mr. Qayyum's statements must be suppressed. *See* Declr. ¶ 29.

**B.     This Court should suppress Mr. Qayyum's statements as involuntary.**

Further, Mr. Qayyum's statement were involuntary and inadmissible on this independent basis. An involuntary statement by a defendant violates the Due Process Clause of the Fifth Amendment, *Colorado v. Connelly*, 479 U.S. 157, 163 (1986), and is therefore inadmissible, *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).

In order to be voluntary, a confession must be "the product of a rational intellect and a free will." *Blackburn*, 361 U.S. at 208. "Both physical and psychological pressure can lead to involuntary confessions." *United States v. Miller*, 984 F.2d 1028, 1030-31 (9th Cir. 1993) (citing *Blackburn*, 361 U.S. at 206). "The test is whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).

A confession is involuntary whether coerced by physical intimidation or psychological pressure. *Townsend v. Sain*, 372 U.S. 293, 307 (1963), *overruled on other grounds* in *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). As the Ninth Circuit recognized in *United States v. Tingle*, "[l]aw enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear a rational intellect and a free will." 658 F.2d 1332, 1335 (9th Cir. 1981) (internal quotations omitted). As the Supreme Court noted in *Malloy v. Hogan*, "[w]e have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." 378 U.S. 1, 7 (1964) (citing *Haynes v. Washington*, 373 U.S. 503 (1963)). It is the government's burden to prove that a confession is voluntary by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

An agent's promise to communicate a suspect's cooperation to the prosecutor does not,

in itself, render a subsequent confession involuntary, but a suspect's will may be overborne if this promise is accompanied by threats or other coercive practices. *See United States v. Harrison*, 34 F.3d 886, 891-92. (9th Cir. 1994). In *Harrison*, an officer informed an arrestee that she was facing up to twenty years of imprisonment and asked her whether she thought it would be better if her sentencing judge were told that she had cooperated with police or that she had not cooperated. The suspect then confessed. *See id.* at 890. The Ninth Circuit held that "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." *Id.* at 891-92 (emphasis in original).

*Tingle* is also comparable. First, in *Tingle*, the agents accused the defendant of lying and became more aggressive and threatening when the defendant continue to deny the allegations the agents were making. *Tingle,* 658 F.2d at 1335. Likewise, in this case, the agents alleged numerous instances of misconduct, and, when denied by Mr. Qayyum, the agents became more threatening. Second, in *Tingle*, the agents informed the defendant that she could go to jail for over 25 years and be separated from her young child. *Id.* Likewise, the agents here told Mr. Qayyum that he could go to jail for twenty years and would be away from his family. Third, in *Tingle*, the agents advised the defendant the benefits of cooperating and that they would bring that cooperation to the attention of the prosecutor. However, they said that if she did not, they would inform the prosecutor that she was stubborn and hard-headed. *Id.* at 1334. Likewise, in this case, the agents told Mr. Qayyum that they were trying to help him and that if he continued to deny the allegations being made by the agents, he could do twenty years in jail.

In determining whether a defendant's will was overborne in a particular case, the court should also consider statutory factors laid out in 18 U.S.C. § 3501(b): "(1) the time elapsing between arrest and arraignment of the defendant; (2) whether the defendant knew the nature of the offense with which he was charged at the time of making the confession; (3) whether the defendant was aware that he was not required to make any statement and that any such statement could be used against him; (4) whether the defendant had been advised of his right to counsel; and (5) whether counsel was present at the time of defendant's confession." Here,

Mr. Qayyum did not know and was never told of the nature of the offenses for which he was being investigated by the FBI, he was not aware and was never told that he was not required to make any statement and that any statement could be used against him, he did not know and was never advised of his right to counsel, and no attorney was present during the FBI's interrogation.

Moreover, the agents' conduct here is the same type of "subtle psychological coercion" that was found to be present in both *Harrison*, 34 F.3d at 890-92, and *Tingle*, 658 F.2d at 1335. This Court should likewise find that the agents' conduct rendered Mr. Qayyum's responses involuntary and suppress his purported statements. Until the government meets its burden of showing that Mr. Qayyum's statements were voluntary, they must be suppressed as involuntary.

### C.  This Court should hold an evidentiary hearing.

If the government opposes this motion, this Court must make factual determinations regarding Mr. Qayyum's alleged statements on September 9, 2016. Specifically, this Court must determine whether the agents violated *Miranda* while questioning Mr. Qayyum, and, under 18 U.S.C. § 3501(a), whether Mr. Qayyum's statements were voluntarily given prior to their admission into evidence. Where factual determinations are required, courts are obligated by Fed. R. Crim. P. 12 to make factual findings. *United States v. Prieto-Villa*, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "suppression hearings are often as important as the trial itself," (*id.* at 609-10 (internal quotations omitted)), these findings should be supported by evidence and not merely an unsubstantiated recitation of allegations in a prosecutor's responsive pleading.

Under 18 U.S.C. § 3501(b), this Court must consider various enumerated and non-enumerated factors in making the voluntariness determination, including whether Mr. Qayyum's will was overborne by the agents and whether he understood the nature of his rights and the consequences of abandoning them. Without the presentation of evidence, this Court cannot adequately consider these statutorily mandated factors.

## IV.  CONCLUSION

For the foregoing reasons, Mr. Qayyum respectfully requests that the Court grant his motion on the papers or hold an evidentiary hearing.

1                            Respectfully submitted,

2

3 Dated: May 15, 2020            BIENERT | KATZMAN PC

4                            *s/ Whitney Z. Bernstein*

5                            Thomas H. Bienert, Jr.
                             James Riddet

6                            Whitney Z. Bernstein
                             Attorneys for Mohammed Abdul Qayyum

**CERTIFICATE OF SERVICE**

Counsel for Defendant Mohammed Abdul Qayyum certifies that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

David W. Wiechert
Jessica C. Munk
William J. Migler
Attorneys for Jacob Bychak

Randy K. Jones
Attorney for Mark Manoogian

Gary Lincenberg
Naeun Rim
Attorneys for Petr Pacas

Melanie Pierson
Sabrina Feve
Assistant U.S. Attorneys

Respectfully submitted,

Dated: May 15, 2020              BIENERT | KATZMAN PC

*s/ Whitney Z. Bernstein*
Thomas H. Bienert, Jr.
James Riddet
Whitney Z. Bernstein
Attorneys for Mohammed Abdul Qayyum