Thomas H. Bienert, Jr., SBN 135311
James D. Riddet, SBN 39826
Whitney Z. Bernstein, SBN 304917
**BIENERT | KATZMAN PC**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
Email: tbienert@bienertkatzman.com
       jriddet@bienertkatzman.com
       wbernstein@bienertkatzman.com

*Attorneys for Mohammed Abdul Qayyum*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> MOHAMMED ABDUL QAYYUM, <br><br> Defendant. | Case No. 18-CR-04683-GPC-3 <br><br> Hon. Gonzalo P. Curiel <br> Date: June 26, 2020 <br> Time: 2:30 p.m. <br><br> **DECLARATION OF MOHAMMED ABDUL QAYYUM** |

**DECLARATION OF MOHAMMED ABDUL QAYYUM**

I, Mohammed Abdul Qayyum, declare as follows:

1. I am a defendant in the case of *United States v. Jacob Bychak, et al.*, Case No. 18-CR-04683-GPC.

2. I make this declaration to support my motion to exclude a statement that the FBI claims I made on September 9, 2016.

3. This declaration is made for a limited purpose, and does not purport to set forth all information I have about this matter.

4. I make this statement pursuant to the holding in *United States v. Simmons*, 390 U.S. 377, 395 (1968), and request that the Court make a finding that nothing contained in this declaration may be offered by the government at trial in its case-in-chief.

5. On September 9, 2016, I was inside my apartment at approximately 8:30 a.m., ironing my shirt and getting ready to leave for work.

6. My wife had just left our apartment to go to her work, and a few minutes after she left, she was back at our apartment's front door and told me that there were FBI agents who wanted to speak to me.

7. At the door to our apartment, two FBI agents in full suits presented themselves, showed their badges, and stated in a loud voice that they would like to ask me a couple of questions.

8. I was concerned that if they continued to speak in that loud voice at my door, that my neighbors would hear them and be concerned. I am always conscious of how I am perceived given my ethnicity and citizenship.

9. This is the very first time that I have ever been visited by any law enforcement officers including agents of the FBI, and I did not realize that I could refuse to speak to them. In fact, neither of the FBI agents advised me that that I was a target of their investigation, that I could refuse to speak to them, that I could consult an attorney before speaking to them, or that I was in any way able to tell them to not come into my apartment.

10. I feared the agents would say something derogatory or make a scene. I felt I had to let them inside my apartment.

11. Had I known that I was a target of their investigation or that I could refuse to be interviewed and check with an attorney before deciding whether to be interviewed, I would not have agreed to let the agents into my home and interrogate me.

12. After the agents came into my home, they began to question me. It is my best recollection that the questioning by the agents began between 8:30 a.m. and 9:00 a.m.

13. One agent did most of the talking while the other agent took notes.

14. During the questioning, the two FBI agents made several allegations against me as to conduct which they maintained I had committed. When I denied these allegations and informed them that they were wrong, the agents became increasing loud, increasingly aggressive, and increasingly threatening, repeatedly telling me to just say that I did it, that I can't hide it, that they're special agents, not regular cops, they can prove it.

15. Some of the aggressive statements they made to me as I continued to deny any wrongdoing, include, but were not limited to, the following:

    (a) Accusing me of "hijacking" IP addresses.

    (b) Telling me that I could write a book on hijacking of IP addresses.

    (c) Documents were shown to me in a hurried form, and when I requested an opportunity to have them and review them, I was told I could not.

    (d) Accusing me of forging documents and creating fake Letters of Authorization ("LOAs").

    (e) Alleging that other people were saying I had forged documents and created these fake LOAs.

    (f) Telling me they had a file of five wire frauds that they could prove at any time.

16. As I continued to deny any wrongdoing, one of the agents said that everybody else is saying that I created these LOA's.

17. As I continued to deny any wrongdoing and tell the agents that they were incorrect, one of the agents, who I think has a first name of Charles, moved his coat to display a gun.

18. As I continued to deny, that agent became more aggressive and angrier at me.

19. I felt scared and confused.

20. The other agent said that they were trying to help me, that they could talk to higher authorities for me if I would help them. I asked to see the documents they were flashing in front of me. He told me not to go in circles, not to think about it, that they were there to help, just listen to them.

21. One of the agents said K.P. orchestrated the illegal things and that they needed help bringing her down. I said that was wrong. He said that they were only talking to me because I lived in a small apartment, not in a big house like the people they knew did these illegal things who profited off of them by making millions of dollars.

22. One or both of the agents said that I could go to jail for twenty years and would be separated from my family, but if I help, they can help me.

23. After repeated denials which continued to upset the agents and cause them to be more aggressive and angrier at me, I determined that it would be better to just not speak. I worried that disagreeing with what the agents were saying was upsetting and offending them and that this could be bad for me.

24. I wanted the interrogation to end. I did not think that I could leave or that I could ask them to leave; if I knew I had the right to do either of these things, I would have.

25. To end the interaction as quickly as I could, I stopped disagreeing with what they said and agreed to help them.

26. I asked how I could help them and one of the agents told me they would tell me what to do and it wouldn't be like James Bond. When I said I was not sure that I could help, they again told me I could do twenty years in jail and should help myself.

27. During the entire interview, the agents made it clear to me that they did not accept

what I was saying and that if I continued to deny wrongdoing, it would go bad for me.

28. The agents demanded that I give them photo ID and my cell phone number.

29. The agents never read me any warnings that I had the right to remain silent, consult with an attorney, or that my statements could be used against me.

30. I believe the entire interview lasted around three hours.

I declare under penalty of perjury of the United States of America that the forgoing is true and correct.

Executed at  OCEANSIDE, CA  on  05/15/2020.

_____
Mohammed Abdul Qayyum

**CERTIFICATE OF SERVICE**

Counsel for Defendant Mohammed Abdul Qayyum certifies that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

David W. Wiechert
Jessica C. Munk
William J. Migler
Attorneys for Jacob Bychak

Randy K. Jones
Attorney for Mark Manoogian

Gary Lincenberg
Naeun Rim
Attorneys for Petr Pacas

Melanie Pierson
Sabrina Feve
Assistant U.S. Attorneys

Respectfully submitted,

Dated: May 15, 2020           BIENERT | KATZMAN PC

*s/ Whitney Z. Bernstein*
Thomas H. Bienert, Jr.
James Riddet
Whitney Z. Bernstein
Attorneys for Mohammed Abdul Qayyum