ROBERT S. BREWER, JR.
United States Attorney
MELANIE K. PIERSON
SABRINA L. FEVE
ASHLEY E. GOFF
RANDY S. GROSSMAN
Assistant United States Attorney
California Bar Nos. 112520/226590/299737/177890
Office of the United States Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel: (619) 546-6761
Randy.Grossman@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MOHAMMED ABDUL QAYYUM (3), <br><br> Defendant. | **Case No. 18-cr-04683-GPC-3** <br><br> **OPPOSITION TO DEFENDANT MOHAMMED ABDUL QAYYUM'S MOTION TO SUPPRESS STATEMENTS** <br><br> **The Honorable Gonzalo P. Curiel** |

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant Mohammed Abdul Qayyum ("Qayyum") has moved the Court to suppress statements he made to the FBI on September 9, 2016. He argues the agents violated *Miranda* and that his statements were involuntary. Qayyum also requests an evidentiary hearing to resolve factual disputes material to the motion.

Based on the declarations submitted by Qayyum and FBI Special Agent Charles Chabalko, there are sufficient facts before the Court to conclude that Qayyum was not in custody, so no *Miranda* violation occurred, and that Qayyum's statements were voluntary under the applicable U.S. Supreme Court and Ninth Circuit case law. Defendant's motion

should therefore be denied. The United States does not, however, oppose Qayyum's request for an evidentiary hearing.

## II. STATEMENT OF FACTS

The United States disputes the facts alleged by Qayyum in his declaration. According to Agent Chabalko's sworn declaration, he and FBI Special Agent Pearson did not restrict Qayyum's liberty or threaten him. Rather, Qayyum voluntarily spoke with agents on September 9, 2016, and voluntarily agreed to retrieve emails and meet with Agent Chabalko regarding these emails the following week.

On September 9, 2016, Agents Chabalko and Pearson met with Qayyum at his apartment. Declaration of Agent Chabalko ("Chabalko Decl.") ¶ 2. Initially, Qayyum's wife greeted the agents at the front door. *Id.* After introducing themselves as FBI agents and showing identification, the agents asked to speak to Qayyum. *Id*. His wife then entered the apartment. *Id.* The short conversation with Qayyum's wife was professional, and she did not appear scared or confused. *Id*.

Qayyum appeared at the front door. *Id* ¶ 3. The agents introduced themselves, presented identification, and asked to talk with Qayyum about his employment at Amobee, formerly known as Adconion Direct. *Id*. Qayyum invited them inside, and they sat on a couch near the front door and were seated there throughout the interview. *Id*.

The agents did not physically restrain or prevent Qayyum from moving freely about the apartment. *Id.* ¶ 4. There was nothing about the circumstances surrounding the interview or the questioning that would have caused Qayyum to believe that he could not terminate the interview. *Id.* At no time did Qayyum ask to terminate the interview. *Id.* ¶ 5. At some point during the interview, Agent Chabalko asked if they could continue or if Qayyum wanted to leave for work. *Id.* Qayyum said they could continue. *Id.*

Neither agent threatened Qayyum. *Id.* ¶ 6. They did not state he could face twenty years in jail or removal from his family. *Id.* During the conversation, Agent Chabalko was wearing a suit jacket and slacks. *Id.* His firearm was concealed in his waistband and

covered by his suit jacket. *Id.* He did not make any gestures to intentionally display his firearm. *Id.*

Agent Pearson and Agent Chabalko spoke with a professional tone throughout the interview and did not raise their voices. *Id.* ¶ 7. Qayyum appeared attentive throughout the interview. *Id.* He did not appear scared or confused. *Id.*

At the conclusion of the interview, Qayyum stated he wanted to cooperate with law enforcement anyway he could. *Id.* ¶ 8. He agreed to provide Agent Chabalko with Adconion Direct emails and meet with Agent Chabalko the following week. *Id.*

During the morning of September 12, 2016, Agent Chabalko called Qayyum to set up another meeting. *Id.* at ¶ 9. Thereafter, they exchanged a series of cordial emails (see *id.* at ¶ 9, Exhibit A, p.1):

> At 10:39 a.m., Agent Chabalko emailed: "Abdul, I left you a voicemail message this morning, thought I would send you a quick email as well. Please call me when you get a chance. Thank you Charles."
>
> At 11:44 a.m., Qayyum emailed: "Hi Charles. Sorry I missed your call. I tried calling you back on your cell right away and left a voice mail. Please let me know when is a convenient time so we can talk again. Regards, Abdul."
>
> At 11:47 a.m., Agent Chabalko emailed: "Sorry I missed you. I will be in a meeting for an hour or so. I also get terrible reception in the office so it's best to call my desk line. Are available to talk around 2pm today?"
>
> At 1:19 p.m., Qayyum emailed: "Hi Charles. Can we meet in person instead sometime before or after regular work hours through the week. Thank you so much in advance for finding time to meet. -Abdul"
>
> At 1:19 p.m., Agent Chabalko emailed: "Yes of course. How about tomorrow morning? 8 am?"
>
> At 2:07 p.m., Qayyum emailed: "Sounds good. Can we meet at Starbucks 10720 Westview Pkwy or at my apartment? We can meet at any place convenient to you, please let me know. Thanks!"

On September 13, 2016, Qayyum met Agent Chabalko at the Starbucks near his apartment. ¶10. Qayyum said he changed his mind about providing emails. *Id.* He agreed to meet with Agent Chabalko on Friday, September 16, 2016 to discuss additional emails in Agent Chabalko's possession. *Id*, Exhibit A, p.1.[1]

### III. ARGUMENT

#### A. *Miranda*, Custody and *Craighead*

The Supreme Court in *Miranda v. Arizona,* 384 U.S. 436 (1966), adopted procedural safeguards to guarantee that suspects are advised of certain rights before a "custodial interrogation." *Id*. at 444-45. An individual is in custody for *Miranda* purposes when the suspect has been "deprived of his freedom of action in any significant way." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). According to the United States Supreme Court, such a deprivation of freedom occurs when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (citation omitted).

To determine whether the suspect was in custody, the court first examines the totality of the circumstances surrounding the interrogation. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Then, it asks whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Id*.; *see also Berkemer*, 468 U.S. at 442, n. 35. The custodial determination, viewed from the totality of circumstances, "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). The factors to be considered include "all of the circumstances surrounding the interrogation," including the "location of the questioning," "its duration," "statements made during the interview," "the

---

[1] A copy of the FBI's reports summarizing the interview on September 9, 2016, and meeting on September 13, 2016, have been produced to defense counsel at ADCONION-DISC02-REPORTS-00609-610; and ADCONION-DISC18-00003-4.

presence or absence of physical restraints," and "the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012).

An interrogation conducted within the suspect's home is not *per se* custodial. *See Beckwith v. United States,* 425 U.S. 341 (1976). On the contrary, courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature. *United States v. Ritchie,* 35 F.3d 1477, 1485 (10th Cir. 1994); 2 Wayne R. LaFave, Criminal Procedure § 6.6 (e) (3d ed. 2007). The element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings. *See Orozco v. Texas,* 394 U.S. 324, 326 (1969). Nevertheless, an interrogation in the suspect's home may be found to be custodial under certain circumstances. *See id.* at 325–26.

The Ninth Circuit has identified four relevant, but "not exhaustive" considerations, in determining whether an interrogation in a defendant's home is custodial: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *Craighead*, 539 F.3d at 1084.

In *Craighead*, eight law enforcement agents from three different agencies went to the defendant's home to execute a search warrant for child pornography on Craighead's computer systems. *Id*. at 1078. At least five agents wore flak jackets, some had un-holstered their weapons, and others were armed. *Id*. An agent requested to talk with Craighead and stated that he was free to leave, he was not under arrest, would not be arrested that day, and that any statement he would make would be voluntary. *Id*. Two agents and Craighead then went to a small, cluttered back room where he was isolated from his family. *Id*. The defendant was not handcuffed. *Id*. The Ninth Circuit ultimately held that the defendant was in custody for purposes of *Miranda* because Craighead's home was a "police-dominated" atmosphere, and the Court suppressed his confession as a result. *Id.* at 1089.

### B. No *Miranda* Violation Occurred Because Qayyum Was Not In Custody

The facts in this case weigh against custody based on an analysis of *Craighead*. First, unlike the team of eight law enforcement agents in flak jackets, Agent Chabalko and Agent Pearson were in business attire during the morning hours, Chabalko Decl. ¶ 6, introduced themselves at the front door, and presented their credentials, *id.* ¶ 3. Qayyum invited the agents into his apartment, *id.* ¶ 3, as opposed to the agents demanding entry pursuant to a search warrant like *Craighead*. Second, Agents Pearson and Chabalko did not restrain Qayyum with force or by threats. *Id.* ¶ 4, 6. They spoke in a professional tone. *Id.* ¶ 7. Third, the agents never isolated Qayyum, nor was he interviewed in a back room as in *Craighead*. Rather, they interviewed him sitting on a couch located near the front door. *Id.* ¶ 3.

As to *Craighead*'s fourth factor, the agents here did not commence the encounter with an admonition that Qayyum could terminate the interview. However, at some point during the interview, the agents did offer Qayyum the option to stop the discussion and go to work. *Id.* ¶ 5. Qayyum declined and agreed to continue. *Id.* He agreed to look for more documents and to meet with the agents <u>again</u> at a later date. *Id.* ¶ 8. Later, when proposing a meeting place, Qayyum offered to meet at either the Starbucks or at his apartment, further demonstrating his comfort in meeting with law enforcement at his home. *Id.* ¶ 9, Exhibit A.

Also, even though an explicit admonition did not come immediately upon Qayyum inviting agents into his home, the fourth factor of *Craighead* is not dispositive to the analysis. "The *Miranda* test for custody does <u>not</u> ask whether the suspect was told that he was free to leave; the test asks whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Craighead*, 539 F.3d at 1088 (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)) (emphasis added); *see also United States v. Wells*, 719 F. App'x 587, 591 (9th Cir. 2017) (finding the defendant was not in custody during an investigative interview at his workplace even though the agents never explicitly said that he was free to leave); *United States v. Busby*, 613 F. App'x 627, 629-

30 (9th Cir. 2015) (finding no custody without addressing whether defendant expressly admonished he could terminate the interview). Under an analysis of all the *Craighead* factors, Qayyum was not in custody.

The facts in this case are similar to other Ninth Circuit cases finding no custody. For example, in *United States v. Quackenbush*, 728 F.App'x 777 (9th Cir. 2018), the Ninth Circuit found no custody where the officers wore plain clothes rather than tactical gear; the officers' firearms were concealed and not drawn; the magistrate judge and district court credited testimony from the Special Agent that the interactions were low-intensity throughout the interview; the defendant was interviewed in the dining room, in view of the apartment open front door; there was no evidence that anyone was barred from entering the apartment; and the defendant was told that he was not under arrest and did not need to answer questions. *Id.* at 779. Similarly, in *Busby,* the Court found that the defendant was not in custody where the officers questioned him at his house, permitted his wife to remain for the questioning, did not un-holster their weapons, used open-ended questions, and did not use improper intimidation or make promises. 613 F. App'x at 630. Also, like the facts here, the Ninth Circuit has found the defendant was not in custody where he voluntarily attended two interviews. *See United States v. Murinko*, 410 F. App'x 2, 5 (9th Cir. 2010) ("He invited the FBI agents into his home for the first interview and suggested that the second interview take place at the FBI office rather than his home.").

Defendant's reliance on *United States v. Blanford*, 467 F.App'x 624 (9th Cir. 2012) is misplaced. In *Blanford*, the Ninth Circuit determined the defendant was in custody during his in-home interview based on evidence that the defendant was isolated during the interview, agents were clearly armed with guns, and agents advised defendant <u>not</u> to have a lawyer present. *Id.* at 625. Here, the threatening, police-dominated environment in *Blanford* does not apply, and there is no evidence that Agent Chabalko or Agent Pearson advised defendant not to have a lawyer present. The differences between the facts of *Blanford* and those now before the Court, as well as the similarities between this case and those where the Courts found no *Miranda* violation, show that Defendant Qayyum was not

in custody when he spoke with Agents Chabalko and Pearson. Accordingly, Qayyum's motion to suppress under *Miranda* should be denied.

### C. Defendant's Statements Were Voluntary

Voluntariness is based on the totality of the circumstances, considering both the characteristics of the defendant and the details of the interrogation. *Shneckloth v. Bustamonte*, 412 U.S. 218, 227 (1976). The totality of the circumstances contains no "talismanic definition" of voluntariness. *Id.* at 224. Courts instead often consider the following factors: the youth of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Id.* at 226. The test applied by the Ninth Circuit is whether, "considering the totality of the circumstances, the government obtained the statement[s] by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009) (citing *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988).

Asking incriminating questions does not make the answers involuntary. *See United States v. Tobie*, 411 F. App'x 995, 996 (9th Cir. 2011) ("Although officers applied a modest amount of psychological pressure to Tobie by coming to his house at an early hour saying that they knew he possessed child pornography, this is insufficient to find that his confession was involuntary."). Similarly, a truthful and noncoercive statement of possible penalties or sentences does not constitute improper coercion, *see United States v. Bautista–Avila*, 6 F.3d 1360, 1365 (9th Cir. 1993), and promising to inform a prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect, *see United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citations omitted).

Here, Qayyum claims the agents overcame his will because: "the agents alleged numerous instances of misconduct, and, when denied by Mr. Qayyum, the agents became

more threatening" (Def. Motion at 9: 12-14); "the agents here told Mr. Qayyum that he could go to jail for twenty years and would be away from his family" (*Id*. at 9: 15-16); and "the agents told Mr. Qayyum that they were trying to help him and that if he continued to deny the allegations being made by the agents, he could do twenty years in jail" (*Id*. at 9: 20-21). Qayyum also claims these circumstances rendered any statements made during the interview involuntary under *United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994) and *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981). He is wrong on the facts and the law.

First, Qayyum's actions during the course of the interview—as described in his own declaration—establish that his will was not overborn. Qayyum continued to deny wrongdoing throughout the course of the interview. Qayyum describes that at times he evaluated that it would be best for him not to speak, and he exercised his free will and rational intellect in choosing not to do so. *See* Declaration of Qayyum ("Qayyum Decl.") ¶ 16, 23 ("I determined that it would be better to just not speak. I worried that disagreeing with what the agents were saying was upsetting and offending them and this could be bad for me.").

Second, agent Chabalko's declaration and supporting emails directly refute Qayyum's allegations that he was threatened. *See* Chabalko Decl. ¶ 6.  The agents did not state that Qayyum could face twenty years in jail or removal from his family. *Id*. Further, Qayyum's actions in the days after his interview contradict any notion that Qayyum was coerced during the interview itself. As described in Agent Chalbalko's declaration (and not disputed by Qayyum), Qayyum agreed to cooperate, retrieve emails and meet with Agent Chabalko the following week. *Id*. ¶ 8. In the days after his interview, Qayyum engaged in ongoing, friendly communications with Agent Chabalko to schedule that meeting. *See id.* ¶ 9, Exhibit A. At one point, Agent Chabalko discusses setting a time for a phone call, and Qayyum responds by asking if he can instead meet <u>in person</u> with Agent Chabalko and thanking him for finding the time to meet. *Id.* When Agent Chalbalko agrees to an in-person meeting, Qayyum emphatically responds, "Sounds good! . . . Thanks!" and invites

Agent Chalbalko to return to Qayyum's home for their meeting. *Id.* Qayyum's communications with Agent Chabalko, desire for another in-person meeting (which he ultimately attended (*see id.* ¶ 10)) and proposal that Agent Chalbalko return to his home undermine any claim that agents overcame his will. *Id*.

Third, Qayyum's reliance on *Harrison* and *Tingle* is misplaced. In *Harrison*, the court of appeal found defendant's statements were involuntary where fifteen agents arrived at defendant's home at 10:00 p.m. with guns drawn and after one of the agents asked defendant whether "she thought it would be better if the judge were told that she had cooperated or had not cooperated." *Harrison,* 34 F.3d at 890. In reaching its decision, the court reasoned, "[t]he improper conduct was the suggestion that [the agents] might inform the court that she had not cooperated." *Id*. at 891. In *Tingle*, during an interview in an FBI car, the court of appeal found that the agent either told defendant that she would not see her two-year old child for a while if she went to prison or that she might not see the child for a while if she went to prison. *Tingle*, 658 F.2d at 1334.

Here, the interview with Qayyum involved two officers in plain clothes, occurred at defendant's home, and no guns were drawn. Also, unlike *Harrison*, Qayyum does not claim the agents suggested they would inform the court or anyone else that Qayyum was uncooperative, only that they could talk to "to higher authorities for [him] if [he] would help them." *See* Qayyum Decl. ¶ 20; *see also United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) ("[a]n interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect) (citations omitted); *United States v. Velasco-Esparza*, No. 19-cr-838-GPC, ECF 37 at 12 (S.D. Ca. Dec. 18, 2019) (finding agent's "offer to help" defendant did not render statement involuntary). Similarly, unlike *Tingle*, the agents did not threaten to remove Qayyum from his family. Chalbalko Decl. ¶ 6.

Finally, Title 18 U.S.C. Section 3501 does not change the analysis. Section 3501 requires the court to make a voluntariness determination before a confession is received in evidence. *See* 18 U.S.C. § 3501 (a). Consistent with the United States Supreme Court and 9th Circuit case law, Section 3501 requires the court to consider "all the circumstances surrounding the giving of the confession…" Based on the analysis of those decisions, Qayyum's statements were voluntary for the reasons mentioned above.

## IV. CONCLUSION

Based on the evidence submitted by Defendant and the United States, defendant was not in custody during his interview on September 9, 2016, and his statements were voluntary. The United States does not object to an evidentiary hearing.

DATED: June 5, 2020                              Respectfully Submitted,

ROBERT S. BREWER, JR.
United States Attorney

*/s/ Randy S. Grossman*
RANDY S. GROSSMAN
Assistant United States Attorney