ROBERT S. BREWER, JR.
United States Attorney
MELANIE K. PIERSON
SABRINA L. FEVE
ASHLEY E. GOFF
RANDY S. GROSSMAN
Assistant United States Attorney
California Bar Nos. 112520/226590/299737/177890
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel: (619) 546-6786
Sabrina.Feve@usdoj.gov
Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MOHAMMED ABDUL QAYYUM (3), <br><br> Defendant. | Case No. 18cr04683-GPC <br><br> **SUR-REPLY IN OPPOSITION TO DEFENDANT MOHAMMED ABDUL QAYYUM'S MOTION TO SUPPRESS STATEMENTS** <br><br> **Honorable Gonzalo P. Curiel** <br><br> Date: June 26, 2020 <br> Time: 2:30 p.m. <br> Ctrm: 2D |

## I.   INTRODUCTION

On June 12, 2020, Defendant Mohammed Abdul Qayyum ("Qayyum") filed a reply brief in support of his motion to suppress (the "Reply"). ECF No. 180. In Section IV of his Reply, Qayyum requests an order from the Court compelling the United States to produce certain discovery and for an opportunity to be heard regarding a protective order recently issued by the Court related to the production of confidential materials. The Court directed the United States to file a sur-reply addressing Qayyum's new discovery request. ECF No. 182. The United States does so here.

The United States opposes Qayyum's request for an order compelling production of additional discovery. Qayyum's discovery request is premature and his portrayal of the United States' discovery efforts is inaccurate. His discovery request also fails to distinguish between material subject to Rule 16 of the Federal Rules of Criminal Procedure ("Rule 16"), and that subject to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act ("Jencks"), 18 U.S.C. § 3500. Production of Jencks and *Giglio* material need occur only after a witness testifies on direct examination, and both logically require there be a hearing or trial at which witnesses will likely be called. In this case, upon receiving Qayyum's motion to suppress and learning his account of the interview, the United States began preparing for a likely evidentiary hearing. To this end, it identified potential witnesses and undertook efforts to locate Jencks and *Giglio* material. It also sought out any evidence that could be deemed material under Rule 16 or *Brady* to the motion to suppress and its newly-disclosed facts. The United States then produced Jencks materials (prior consistent statements for its potential witnesses, FBI Special Agents Charles Chabalko and Jason Pearson) in advance of the evidentiary hearing and is actively conducting a review under *Gigilio* and *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991), of which both the Court and defense counsel are aware. In light of these ongoing and active efforts, Qayyum's discovery requests are premature.

In particular, the United States anticipates producing additional confidential materials requested by Qayyum once it obtains the materials from FBI headquarters, has the opportunity to review the materials, and, if needed, submits the materials for *in camera* review and a protective order. With that production, the United States will have made a reasonably diligent effort to produce the discoverable materials that are in its possession and responsive to Qayyum's requests. These current efforts build upon the United States having repeatedly demonstrated its commitment to, and recognition of,

its ongoing discovery obligations. Accordingly, the United States requests that the Court deny without prejudice Qayyum's request for a discovery order.

## II. FACTUAL & PROCEDURAL BACKGROUND

### A. *Discovery Produced Prior to Qayyum's Motion to Suppress*

Qayyum and his codefendants were indicted on October 31, 2018 and arraigned on November 1, 2018. On November 4, 2018, the United States produced in discovery the 257 exhibits submitted to the grand jury (888 pages). On December 4, 2018, the United States produced approximately 180 reports generated by the FBI (about 850 pages). This discovery included the report, or "302," written by Agent Chabalko describing his and Agent Pearson's September 9, 2016 interview with Qayyum. Between December 17 and 20, 2018, the United States produced 55 gigabytes (922,971 pages) of discovery, which contained evidence obtained from search warrants and subpoenas.

On January 23, 2019, the United States produced plea agreements and addendums for two cooperating defendants, along with additional FBI reports relating to recent investigative efforts (i.e., those occurring during the latter half of 2018), bank records, and subpoena responses from third-party providers. On March 13, 2019, the United States produced records it received in February 2019 from a mail-forwarding service used by Defendants, along with records previously obtained from Yahoo!. On May 15, 2019, the United States produced records received in April 2019 from a holding company controlled by Defendants' employer, criminal history reports for a cooperating defendant, and legal process served on Yahoo!. On June 4, 2019, the United States produced email records Defendants' employer had recently provided, two witness interview reports, and two emails obtained from a cooperating defendant's lawyer. On August 15, 2019, the United States produced records it had recently obtained from both ARIN and Defendants' employer. On November 7, 2019, the United States produced records it had again recently obtained from Defendants' employer and 12

emails involving a cooperating defendant. On December 16, 2019, the United States produced in discovery a December 2019 news article involving hijacked netblocks associated with Defendants' employer. On January 9, 2020, the United States produced records it had recently obtained from Defendants' employer relating to the hijacked netblocks discussed in the December 2019 news article. Whenever possible, the United States compiled and provided a detailed index of the materials it was producing in discovery.

### B. *Discovery Relating to Qayyum's Motion to Suppress*

On May 15, 2020, Qayyum filed a motion to suppress the statements he made to the FBI in September 2016. ECF No. 162. In support of his motion, he submitted a sworn declaration. *Id.* This was the first time the United States heard Qayyum's account of his interview. Prior to filing the motion, Qayyum's counsel had contacted the prosecution regarding discovery requests relating to the September 2016 statements. In particular, on January 6, 2020, Qayyum's attorney asked the United States for: (1) reports regarding the FBI's interviews with Qayyum on September 9, 12, and 13, 2016, including rough notes; (2) a list of individuals present at those interviews; (3) any audio or video recordings of the interviews; and (4) any reports or notes of the procedures the agents intended to utilize or statements they intended to make during the interviews. On January 14, 2020, defense counsel followed up and also requested: (5) documents and reports showing when agents arrived at Qayyum's residence, when the interview began, and when the interview ended; (6) identification or production of the documents brought to the interview and shown to Qayyum; and (7) documents showing the FBI or United States Attorney's Office position as of September 9, 2016 regarding whether Qayyum was a witness, subject, or target.

On January 15, 2020, the United States responded. It provided the exact Bates numbers for the report on Qayyum's interview and for the documents shown to Qayyum during the interview (previously produced in December 2018). The prosecutors advised

1  defense counsel that the interview was not recorded and that the report named everyone
2  present during the interview. The United States further advised defense counsel that it
3  had conducted a search in response to defense counsel's January 6 and January 14, 2020
4  emails and found no documents discussing or regarding the agents' plan for the
5  interview or any discussion of Qayyum's status as a witness, subject, or target. The
6  United States said it had not located any rough notes to date, but would produce them
7  if they were found.

8       On January 16, 2020, Qayyum's counsel replied, indicating Qayyum believed
9  that Agent Pearson had taken notes during the interview and requesting that the United
10 States ask Agents Pearson and Chabalko if either made notes and, if they did, do they
11 still exist and if not, when and why did they destroy them. Counsel also asked for any
12 records that would show when the interview began and when it concluded. That same
13 day, the United States responded. The United States advised defense counsel that it had
14 repeatedly consulted with the agents after defense counsel's January 6 and January 16,
15 2020 emails, and that on both occasions learned that Agent Pearson took no notes. The
16 United States added that Agent Chabalko had "indicated it was his practice, if he took
17 notes, to place them in the 1A portion of the FBI files. He checked the 1A folder and it
18 contained the documents he showed your client during the interview but no notes." The
19 United States added that there were "no records indicating the time the interview began
20 and ended." The United States closed by stating that, during this follow-up, it had found
21 an email chain exchanged between Qayyum and Agent Chabalko and that the email
22 chain would be produced "immediately, along with a new report from Agent Chabalko,
23 documenting his non-substantive contact with your client."

24      On January 17, 2020, the United States produced the emails exchanged between
25 Qayyum and Agent Chabalko to schedule a follow-up meeting and a report prepared by
26 Agent Chabalko on January 16, 2020, which described the brief follow-up meeting with
27
28

Qayyum at Starbucks and the date and circumstance in which Agent Chabalko learned that Qayyum was a represented party.

On January 28, 2020, defense counsel sent a supplemental discovery request seeking: (1) review of Agents Chabalko and Pearson's personnel files for, and discovery of, any evidence of perjury, dishonesty, complaints, demotions, discipline; (2) any directives to Agents Chabalko and Pearson in advance of their interview of Qayyum; (3) any FBI policy memos regarding (a) when a 302 should be prepared, (b) recording interviews with subjects and targets, and (c) note-taking of subjects and targets. The same day, the United States replied that it was aware of its "obligation to provide impeachment information with regard to our witnesses" and advised that, if discoverable information exists in the testifying agents' personnel files, it would be provided."[1]

On February 19, 2020, defense counsel responded to the government's January 28, 2020 email. Counsel reiterated its requests for categories #2 and #3 and stated that they were also requesting the following additional discovery: (4) all drafts of the 302 report; (5) all communications between the agents and between the agents and any AUSA regarding the drafts; and (6) any and all changes to the drafts. The United States responded that same day and provided defense counsel with the FBI policies they had requested, noting that while it did not believe disclosure was required, the policies were already public. The United States also replied that, with regard to the rest of defense counsel's requests, "no records exist that are responsive."

After Qayyum filed his motion and supporting declaration on May 15, 2020, the United States had the opportunity to review his statement for the first time. Based on the facts of that statement (including new allegations regarding an agent displaying a

---

[1] On January 28, 2020, the government also submitted an internal request for *Henthorn*-related material regarding Agents Pearson and Chabalko. This request is not itself discoverable, but can be provided *ex parte* to the Court if needed.

*Gov. Sur-Reply in Resp. to Def.'s Motion to Suppress*
18cr4683-GPC

-6-

firearm that had never previously been disclosed), as well as the likelihood that Agents Chabalko and Pearson would testify, the United States undertook a review of potential Jencks and *Giglio* material. In response to this review for Jencks and *Giglio*, the government produced: (1) Jencks material for Agent Chabalko in the form of prior grand jury testimony, which it produced on June 1, 2020; (2) Jencks material for Agent Chabalko in the form of an email he sent on September 13, 2016 that Qayyum was "talking," which it produced on June 12, 2020; and (3) Jencks material in the form of emails between Agents Pearson and Chabalko on September 13, 2016, wherein (a) Agent Chabalko advised his squad he would miss a morning meeting because "I have a meeting with a cooperator regarding my IP hijacking investigation this morning at 8 am. I should be in the office around 9:30 am," and (b) Pearson responded to just Chabalko, "Best of luck with that, Chuck – let me know how it goes!!," which it produced on June 16, 2020. The United States has also undertaken a review for potential *Giglio* information.

On June 1, 2020, after receiving Agent Chabalko's grand jury statements, defense counsel contact the United States and requested that it state: (1) whether there was any other discovery relating to Qayyum's interview; (2) whether there were any other documents or recordings relating to Qayyum's interview; (3) whether the FBI, government, or agents ever had written notes, voicemails, or records regarding the interview and, if so, why those records no longer existed; (4) whether Agent Chabalko disavowed having taken notes; (5) whether Agent Chabalko reviewed any of Qayyum's statement prior to or during his grand jury testimony; and (6) what Agent Chabalko reviewed prior to or while writing his report on his follow-up meeting with Qayyum at the Starbucks and the identity of any individual with whom Chabalko communicated with before writing his report.

The next day, on June 2, 2020, the United States responded. The United States advised defense counsel that the grand jury testimony it had received on June 1, 2020

-7-

*Gov. Sur-Reply in Resp. to Def.'s Motion to Suppress*
18cr4683-GPC

1  was "advance Jencks material for Agent Chabalko" and contained "no information
2  whatsoever that was not contained in his report of the interview, disclosed pursuant to
3  Rule 16 in the initial production of discovery." The United States also advised that it
4  was unaware of any legal authority whereby the United States was required to create
5  documents that do not exist to answer questions.
6       A week later, on June 10, 2020, defense counsel responded by reiterating their
7  demand for answers to the questions raised in their earlier email. Further, in light of
8  having received discovery pursuant to a protective order (the "confidential materials"),
9  they requested additional evidence. The next day, on June 11, 2020, the United States
10 responded, "[a]fter receiving your message yesterday, we have been diligently trying to
11 obtain the requested records for review. We have come to learn that the records you
12 request relating to [the confidential materials] are not in the San Diego office of the FBI
13 but instead reside in Washington, DC. We are further advised that, due to low staffing
14 . . . due to the pandemic, it could take as much as two weeks or more to obtain the
15 records you request. In light of these facts, we do not oppose any request to continue
16 the hearing to a later date." On June 12, 2020, the day after receiving this email, Qayyum
17 filed his Reply in which he included a motion for discovery.

18 **III.   ARGUMENT**

19      Qayyum moves the Court for an order compelling production of three categories
20 of documents, the first of which appears to subsume the latter two: (1) "any additional
21 discovery" related to Qayyum's interview; (2) "any other statements, recordings,
22 reports, or writings" related to Qayyum's interview; and (3) a "government response"
23 to the question of whether there were notes of Qayyum's interview. Reply at 5. The
24 Court should deny his requests because the United States has complied with its
25 obligation to produce the discovery in its possession to which Defendant is entitled
26 under Rule 16, *Brady*, *Giglio*, and Jencks, and it will continue to do so with respect to
27 the outstanding request for confidential materials. Qayyum's requests for any additional
28

*Gov. Sur-Reply in Resp. to Def.'s Motion to Suppress*  -8-
18cr4683-GPC

discovery beyond what the United States has provided and is in the process of obtaining go beyond the scope of Rule 16 or *Brady* and are premature under *Giglio* and Jencks.

### A. *Rule 16 and <u>Brady</u>*

Under Rule 16(a)(1)(A) and (B), the government must disclose to a defendant "the substance of any relevant oral statement made by the defendant" and "copies of any relevant written or recorded statement by the defendant if the statement is within the governments possession, custody, or control." A defendant also has a right to inspect all documents, data, or tangible items within the government's "possession, custody, or control" that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). Evidence is "material" under Rule 16 if it is helpful to the development of a possible defense. *United States v. Olano*, 62 F.3d 1180, 1203 (9th Cir. 1995). A defendant must make a "threshold showing of materiality" in order to compel discovery pursuant to Rule 16(a)(1)(E). *United States v. Budziak*, 697 F.3d 1105, 1111 (9th Cir. 2012) (quoting *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995)). "Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense." *Id.* (quoting *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990)). Similarly, "*Brady* does not establish a 'duty to provide defense counsel with unlimited discovery of everything known by the prosecutor'" nor does "mere speculation about materials in the government's files" require the district court to make those materials available or conduct an in camera review. *United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986).

Here, the United States has complied with its obligations to provide Qayyum with his statements under Rule 16(a)(1)(A) and (B). The government has produced copies of the FBI reports related to those statements, repeatedly inquired with the FBI into the existence of notes, and has explained to Qayyum's counsel the inquiry the United States has undertaken to provide them with responsive and discoverable statements.

To the extent Qayyum relies on Rule 16(a)(1)(E) to support his broad, catch-all requests for "any additional discovery" and "additional statements", those requests are overbroad in that he does not limit them to material or exculpatory information under Rule 16 or *Brady*. Rule 16 and *Brady* do not support general fishing expeditions, nor do Qayyum's broad requests help the United States understand what he believes is missing. *See United States v. Mincoff*, 574 F.3d 1186, 1199–2000 (9th Cir. 2009) (affirming denial of discovery motion where defendant speculated about information in the government's file and had "not identified any potentially exculpatory evidence that was not disclosed to him"); *Michaels*, 796 F.2d at 1116 (affirming denial of motion to compel interview notes under *Brady* where the defendant "offer[ed] no reason for believing that the notes contain[ed] significant material that [was] not contained in the typed [interview] summaries").

Rather than satisfying Rule 16's materiality standard or claiming exculpatory information exists, Qayyum focuses on the United States' recent productions as the basis for his demands. As described above, the United States has produced responsive discovery to Qayyum and has continued to produce additional documents when it received new information or new discovery obligations arose. For example, when counsel for Qayyum articulated that additional documentation regarding contact with him might be material in January 2020, the United States reviewed its files and produced responsive documents under Rule 16. *See* Reply at 4. Then, before the Court even granted an evidentiary hearing on Qayyum's motion to suppress, the United States evaluated its likely new discovery obligations under *Giglio* and Jencks and began proactively producing sworn testimony, emails (described above), and confidential materials that were not previously subject to production. Those subsequent productions do not show that material undisclosed discovery exists, as Rule 16 requires. Instead, they show that the United States has continually understood and complied with its

discovery obligations, including supplementing productions when new discovery obligations were triggered by potential agent testimony.

Qayyum's third discovery request for a "government response" further falls outside the scope of Rule 16 and *Brady*. Qayyum recognizes that the United States already informed him that it has inquired of the agents and been told that no rough notes of the interview exist. Reply at 4. That response should end the inquiry. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) ("Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.").

Despite having received a response to his question and lacking any tangible evidence to the contrary, Qayyum asks the Court to order the United States to create a "government response." Reply at 4. Rule 16 and *Brady* do not, however, require the United States to manufacture evidence. *See United States v. Sukumolahan*, 610 F.2d 685, 687 (9th Cir. 1980) (finding *Brady* does not require the government "to create exculpatory evidence that does not exist"); *United States v. Rigmaiden*, 844 F.Supp.2d 982, 997 ((D. Ariz. Jan 5, 2012) (citations omitted) ("The rule does not require the government to create documents that may provide information a defendant desires to obtain, nor does it require the government to present agents or witnesses for interviews or in-court examination."); *United States v. Cameron,* 672 F. Supp. 2d 133, 137–39 (D. Me. 2009), *amended* (Nov. 30, 2009) (noting the defense's discovery demands "sound[ed] more like civil interrogatories under Civil Rule 33 than document requests under criminal Rule 16(a)(1)(E)").

The United States has provided discoverable materials in its possession under Rule 16 and *Brady*, and Agents Chalbalko and Pearson will be available to testify at the evidentiary hearing on Qayyum'ss motion to suppress. To the extent he seeks further discovery on this point, Qayyum has not explained why it is material or exculpatory, or how the nonexistent records are in the government's "possession, custody, or control"

as required by Rule 16(1)(E). His request for further response to his question about whether there were notes should therefore be denied.

B. *Jencks* and <u>*Giglio*</u>

Production of witness statements is governed by Jencks, and need occur only after the witness testifies on direct examination. *Mincoff*, 574 F.3d at 1200; *United States v. Taylor*, 802 F.2d 1108, 1118 (9th Cir. 1986) (Jencks "limits compulsory pretrial discovery of statements made by prospective government witnesses and makes them unavailable until such witnesses have testified at trial."); *United States v. Mills*, 641 F.2d 785, 790 (9th Cir. 1981) (Rule 16(a)(2) excludes from pretrial discovery "statements made by government witnesses or prospective government witnesses" except as provided by Jencks).

*Giglio*, which arose under *Brady*, requires the prosecution to disclose "any promises, inducements, or threats made to witnesses to gain cooperation in the investigation or prosecution." *Mincoff*, 574 F.3d at 1199 (citations omitted). Both the Supreme Court and Ninth Circuit have generally interpreted *Giglio* to require the production of evidence that would impeach a government witness's testimony. *See, e.g., United States v. Bagley*, 473 U.S. 667, 676-77 (1985); *United States v. Baker*, 988 F.2d 77, 79 (9th Cir. 1993) ("the duty imposed on the prosecution in *Brady* extends not only to exculpatory information about the defendant but also to information about witnesses which would undermine the government's case"); *United States v. Salyer*, 271 F.R.D. 148, 151 (E.D. Cal. 2010). Impeachment material need not be disclosed under *Giglio* until after a witness testifies. *United States v. Rinn*, 586 F.2d 113, 119 (9th Cir. 1978) (impeachment information subject to *Giglio* "need not be disclosed prior to the witness testifying."); *Salyer*, 271 F.R.D. at 151.

To the extent Qayyum seeks discovery under *Giglio* or Jencks, a discovery order is unnecessary and premature. The United States has voluntarily produced Jencks material without either a court order or a set hearing date, and recognizes that its

obligations under *Brady* and *Giglio* cover not only exculpatory evidence, but also evidence that could be used to impeach witnesses who testify on behalf of the United States. As evidenced by its proactive disclosure of the confidential materials in this case, the United States is aware that this obligation also extends to evidence that was not requested by the defense. *Bagley*, 473 U.S. at 682; *United States v. Agurs*, 427 U.S. 97, 107-10 (1976).

The United States has provided discoverable materials in its possession that potentially fall within Jencks and *Giglio* and is diligently working with the FBI to obtain additional confidential materials that may exist to further comply with Jencks and *Giglio*. Those materials, to the extent they exist, are at FBI headquarters in Washington D.C., which is currently under limited staffing due to the COVID-19 pandemic. Nonetheless, the United States is working diligently to gain access to the materials. Ruling on the discoverability of that material is premature because the scope of responsive materials is currently unknown and the United States is exercising due diligence to obtain them. The United States recognizes its discovery obligations and will produce discoverable information once and if it receives any. To the extent the United States is unsure of its discovery obligations and intends to withhold materials received in relation to these requests, it will submit the relevant materials to the Court for *in camera* review. Accordingly, the Court should deny as premature the requests for a discovery order as to *Giglio* or Jencks material and revisit them if disputes exist after receipt of the relevant materials.

Finally, the United States disagrees with Qayyum's assertion that the amended protective order issued by the Court on June 8, 2020 unduly restricts his ability to investigate. To the contrary, Paragraph 5 of that order expressly permits Qayyum's counsel to disclose the materials to "assistants" involved in investigating the case and thus does not impede Qayyum's own defense team. Qayyum has not explained why a

broader disclosure to unidentified "witnesses" or the "broader defense group" is necessary or justified.

## IV. CONCLUSION

For the reasons discussed above, the Court should deny Qayyum's request for an order compelling discovery or modifying the Court's amended protective order.

DATED: June 19, 2020                         Respectfully Submitted,

                                                    ROBERT S. BREWER, JR.
                                                    United States Attorney

                                                    *Sabrina L. Feve*
                                                    SABRINA L. FEVE
                                                    Assistant United States Attorney