1            UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,      .
                                   .
5                  Plaintiff,      . No. 18-cr-4683-GPC
                                   .
6                  v.              . June 26, 2020
                                   . 2:30 p.m.
7   MOHAMMED ABDUL QAYYUM,         .
                                   .
8                  Defendant.      . San Diego, California
    . . . . . . . . . . . . . . . .

9

10           REDACTED TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE GONZALO P.
11          CURIEL UNITED STATES DISTRICT JUDGE

12

13  APPEARANCES:

14  For the Plaintiff:      United States Attorney's Office
                            By: SABRINA FEVE, ESQ.
15                              ASHLEY E. GOFF, ESQ.
                                RANDY S. GROSSMAN, ESQ.
16                          880 Front Street, Room 6293
                            San Diego, California 92101
17
    For the Defendant:      Bienert Katzman, PC
18                          By: WHITNEY Z. BERNSTEIN, ESQ.
                            903 Calle Amanecer, Suite 350
19                          San Clemente, California 92673

20

21

22  Court Reporter:         Chari L. Bowery, RPR, CRR
                            USDC Clerk's Office
23                          333 West Broadway, Suite 420
                            San Diego, California 92101
24                          chari_bowery@casd.uscourts.gov

25  Reported by Stenotype, Transcribed by Computer

1        SAN DIEGO, CALIFORNIA; JUNE 26, 2020; 2:30 P.M.

2                              -o0o-

3            THE CLERK:  Calling Item Number 6 on the calendar,

4    Case Number 18-cr-4683, U.S.A. v. Mohammed Abdul Qayyum, on for

5    a motion hearing re: discovery.

6            THE COURT:  Good afternoon, Counsel.

7            ALL:  Good afternoon, Your Honor.

8            THE COURT:  We are here handling a discovery matter

9    that was raised in the reply filed by the defense on June 12.

10   And let me provide some background.  There are a number of

11   moving parts in this matter.

12       As recounted by the government in its surreply, filed

13   June 19, there has been a significant amount of discovery that

14   has been produced during these proceedings, and some of it

15   relates to statements that are attributed to Mr. Qayyum back in

16   September 2018, I believe.  And the discovery has led the

17   defense to file a motion to suppress statements.  That was

18   filed on May 15th, this year.

19       And upon reviewing the motion to suppress, it was -- if

20   not obvious, it was, in the government's view, a possibility

21   that there would be an evidentiary hearing to permit a proper

22   record to be made on a motion to suppress statements.  Given

23   that belief or opinion, the government took steps to identify

24   and produce material that was discoverable under Jencks,

25   *Giglio*, and *Henthorn*.

1    As to *Henthorn* material, the government identified certain

2  events relating to a disciplinary proceeding that concluded in

3  2019.  Based upon its review of those disciplinary proceeding

4  documents, an *ex parte*, *in camera* application was made by the

5  government on or about June 3.  It might have been submitted

6  June 2.  But in any event, the Court reviewed it and submitted,

7  presented an order on June 3, which directed the government to

8  disclose certain information.

9    The Court, based upon its review, determined that

10  something like four or five sentences that were contained in

11  the materials did not need to be produced, given, in the

12  Court's view, that they did not relate to the charges that were

13  made and that were and formed the basis for disciplinary action

14  taken against the agent in this matter, who is the agent who

15  was involved in the interview of Mr. Qayyum in this case.  So

16  that agent is Special Agent Charles Chabalko.  So that's the

17  reason why the Court ended up allowing for -- if not allowing,

18  directing that the government not produce those additionally

19  redacted sentences.

20    In addition, what was produced contains redactions that

21  were made, evidently, back at headquarters.

22    The government has recently filed an application for an

23  order to disclose confidential personnel materials.  The Court

24  signed that order on June 23, I believe, and it requires FBI

25  headquarters to turn over or provide to the U.S. Attorney's

1    office here certain materials that relate to an Agent Reed, and

2    that otherwise may contain discoverable material.

3         And I will back up and note that upon the receipt of the

4    *Henthorn* materials relating to Agent Chabalko, there was

5    additional discussion between defense counsel and the

6    government and additional requests for materials, and this

7    application for order also I believe relates to that.

8         So, at this point, there's, essentially, three matters

9    before the Court.  One relates to the defense request for three

10   sets of materials -- that is, any additional discovery related

11   to Qayyum's interview; any other statements, recordings,

12   reports, or writings related to Qayyum's interview; and a

13   government's response to the question of or not there were

14   notes of Qayyum's interview.  That's one group.

15        Second, the Court is asked to modify its protective order

16   in this case so as to permit others to learn about and review

17   the materials that have been provided under protective order.

18        And then, third, there are those materials that are the

19   subject of the application for order to disclose confidential

20   personnel materials.  That group is the one that's the easiest

21   to address because, at this point, the FBI, as I understand it,

22   is still collecting those materials and will be providing them

23   to the government; and then, at that time, the government will

24   conduct its review and, if appropriate, make an *in camera*

25   submission regarding those materials.  So, with that being the

1    case as to that request, the Court proposes we set a further

2    status hearing regarding these discovery matters so that we can

3    determine how that plays out.

4         As to the first group of requests -- that is the three

5    categories of documents sought -- it's clear to me that the

6    defense is seeking further information related to the obtaining

7    of the statement from the defendant, Mr. Qayyum.  And it

8    probably occurs to the defense that it is surprising that there

9    are no rough notes, at a minimum, for an interview that lasted

10   approximately three hours, but that is what the government has

11   been told.

12        And so I expect that when we do have a hearing -- and we

13   will have a hearing on this motion -- the defense can inquire

14   of Agent Chabalko and Agent Pearson and determine whether or

15   not they had ever prepared any notes.  And if not, if it is

16   their practice to go about interviewing people without any

17   recording, without any notes to rely upon in preparing the 302

18   reports that are ultimately generated.  But at this point, it

19   sounds like the government has taken all the actions, has made

20   all the necessary inquiries that is required of them to follow

21   up on the defense's request.

22        My tentative is I am not prepared to order them to produce

23   something that does not exist, at least according to the

24   reports of the government.  And as to the request to direct the

25   government to state on the record or to otherwise affirm that

1    there were no notes, at this point, I am satisfied that what

2    the government has described as their procedures in this case

3    amounts to, essentially, a response of whether or not there

4    were notes of Qayyum's interview.

5        Certainly, the assistant U.S. attorneys handling this case

6    are not in a position to guarantee 100 percent whether or not

7    there were notes.  What they can do is inquire of the FBI and

8    its agents to determine whether or not there are notes.  That's

9    taken place.  And to the extent that there are notes or that

10   there were notes and they were destroyed, then those are

11   matters that can be taken up with the witnesses themselves.

12   But at this point, there's not some type of requirement that

13   the government write out in blood or otherwise that there were

14   no notes.

15       At the same time, I understand that the defense has some

16   serious questions about whether or not there were notes, given

17   what I have reviewed, given what they know about this case and

18   this interview.

19       So that would be my tentative as to that portion of the

20   requests that are before the Court.

21       And then, as to the final request -- that is, to modify

22   the protective order -- at this point, I am not sure what more

23   the defense believes is appropriate.  Keeping in mind that, as

24   a starting point, I do not believe that it is appropriate to

25   share these materials with all codefendants, given that they

1    don't have standing, from what I can tell, to file a motion to

2    suppress statements.  They do not appear to have similarly

3    situated statements where Agent Chabalko was involved in the

4    obtaining of statements.  As I understand it, the government

5    does not intend to call Agent Chabalko at trial.  I could be

6    mistaken about that.  I could be wrong.  But at this point,

7    there does not appear to be, in my view, any good reason why

8    this *Henthorn* material as to Agent Chabalko should be produced

9    to all of the defendants, but I am prepared to hear more about

10   the defense position with respect to that protective order.

11         And so, with those preliminary comments and observations,

12   I am prepared to hear from you, Ms. Bernstein.

13              MS. BERNSTEIN:  Thank you, Your Honor.

14         I am going to go back to the first matter that the Court

15   addressed, which was the history of the case, and I just wanted

16   to clarify because I think I missed what the Court said for a

17   moment.

18         I understand that the confidential discovery was produced

19   to the Court with two sets of redactions, one that came from

20   FBI headquarters, which is being addressed, as the Court

21   explained, and one that were additional redactions that appear

22   in yellow, that the government had proposed.  And did the Court

23   indicate that you endorsed those additional redactions because

24   they did not apply to Agent Chabalko?

25              THE COURT:  No.  I endorsed the redactions because,

1  in the Court's view, they did not relate to the charges that

2  led to the discipline.  They did not relate to what was viewed

3  as reflecting poorly on the FBI or leading to these

4  disciplinary proceedings.  They were facts that were in the

5  background.  And, given that they did not appear to relate to

6  what led to the discipline, in the Court's view, there was no

7  justification to have it released, provided.  And the Court

8  would not have, under any circumstances, allowed it to be used

9  for impeachment, and the Court did not see that that

10  information would somehow or another lead to information that

11  would be admissible or the proper subject of impeachment.

12          MS. BERNSTEIN:  Thank you for clarifying that.  I am

13  sorry that I did not understand that.

14      I will dispose of these issues, I think, in the easiest

15  fashion, if that's okay.

16          THE COURT:  Yes.

17          MS. BERNSTEIN:  So I will go back to the request

18  which was made in our reply on this motion for the three

19  discovery requests, and we asked for any additional discovery

20  related to the government's interrogation; any other

21  statements, and recordings, reports, writings.  And we

22  clarified that this includes but is not limited to documents,

23  notes, reports, recordings, messages, voice mails, emails,

24  calendars, testimony, et cetera.  And there's the third issue

25  of notes.

1    As for the first two, the government, sort of, explicitly

2  suggests that we haven't met a threshold of materiality.  I

3  don't know if the government is seriously disputing that

4  discovery related to its interrogation is not material to this

5  case and this pending motion.

6    The government likewise suggests that nothing exists and

7  that I am asking them to manufacture evidence.  So I just want

8  to clarify that that is, of course, not what we are asking for.

9    We are asking for a direct statement on that, and we

10 haven't gotten one from the government.  And if the direct

11 statement is that nothing else exists, then that's fine.  But

12 there have been rolling productions, and we can quibble about

13 whether those productions are necessary under Jencks or under

14 *Brady* or under Rule 16, but my concern is that there have been

15 ongoing productions in this case related to -- I received the

16 other week, perhaps even this week -- related specifically to

17 the September 2016 interrogation of my client.

18     THE COURT:  Ms. Bernstein, I agree with you that, by

19 virtue of the government's response, it would lend itself to

20 the interpretation that you have given it, that somehow or

21 another the government does not believe that the defense is

22 entitled to the defendant's statements or any and all

23 information related to those statements, how they were

24 obtained.

25   At the same time -- and I will ask the government to

 1   clarify on this -- but from what I have reviewed in the

 2   voluminous statement of facts relating to discovery in this

 3   case, that upon the motion to -- actually, before the motion to

 4   suppress was filed, that at the point in time when inquiries,

 5   further inquiries were made as to the statements, that the

 6   government took steps to inquire as to what discovery existed,

 7   either in the form of written statements, of audio- or

 8   video-recorded statements, as to notes that memorialized any

 9   interviews, and any other documents that related to the

10   statements.  And along those lines, that there was -- there

11   were emails discovered that related to communications between

12   your client and the FBI agent where arrangements were being

13   made for follow-up meetings to allow Mr. Qayyum to review

14   certain documents and identify them.

15       So, it looks like, from what the government did, that they

16   agree that you are entitled to your client's statements and

17   recordings and notes and related documents.  But in their

18   response, there is this reliance on cases that seems to have a

19   disconnect because they appear to relate to cases where there

20   hasn't been a sufficient showing that a particular area or

21   particular type of document is discoverable.

22       Let me ask whoever is speaking on behalf of the government

23   on this matter.  At this point, is what I understand to be the

24   case in fact the government's position, that you agree that the

25   defense is entitled to defendant's statements and notes and

1    recordings and related documents, and you have made that

2    inquiry; but at this point, you are of the view that you have

3    exhausted or you have concluded your search for documents that

4    are otherwise discoverable under Rule 16, Jencks, *Giglio* and

5    *Henthorn*?

6            MS. FEVE:  Your Honor, Sabrina Feve for the United

7    States.

8        I can proffer to the Court.  Obviously, as an attorney, I

9    can't be a witness, and that's part of the tension here.  And

10   we will be providing witnesses at the hearing who the defense

11   can cross-examine.  But I can certainly proffer that we have

12   repeatedly asked the agents for any existing records,

13   understanding and including voice mail and email and any other

14   notes, relating to the September 2016 interview with

15   Mr. Qayyum.

16       And we have also repeatedly advised defense counsel of the

17   fact that we have inquired with the FBI.  And I even include a

18   quote from the email, where we went into very specific detail

19   and told them exactly what Agent Chabalko said, which is that

20   it was his practice, if he kept rough notes, to put them in the

21   1-A file that accompanied the 302; that he had gone back and

22   checked the 1-A file, where he had found the documents he had

23   shown to Mr. Qayyum, but no notes.

24       So this is not a situation where we might have been

25   unresponsive or are being glib and refused to engage the merits

 1   of their question.  So as far as our diligence on our end and

 2   understanding our discovery obligations, proactively seeking

 3   out Rule 16, *Brady*, *Giglio*, Jencks, and *Henthorn*, we have

 4   absolutely done so.

 5       But I do think that, perhaps, if the Court doesn't like

 6   the cases we cited for *Brady* and Rule 16 -- but it is more than

 7   a mere quibble to distinguish between what is discoverable

 8   pursuant to Rule 16 and what is discoverable pursuant to

 9   Jencks.

10       Within weeks of being arraigned, the defendants had access

11   to the 302 that summarized the interview of Mr. Qayyum from

12   September of 2016.  It is true that when we later were able to

13   find an email showing that there had been some subsequent

14   contact and to facilitate the production of those details,

15   which didn't exist, Agent Chabalko created an additional 302,

16   which was produced in January.

17       But the fact is, as far as the Rule 16 issue and the

18   statements that are sought to be suppressed, the only

19   statements that are at issue are the same statements that are

20   documented in the 302 that was produced in December of 2018.

21       And so our position has been we understand we have an

22   ongoing obligation to cross all of these legal doctrines.  But

23   we also recognize that timing can make a difference.  To say

24   that we somehow acted poorly or in bad faith or irresponsibly

25   by distinguishing between Rule 16 and Jencks is to ignore the

1   fact that Jencks has a very different discovery deadline.  And,

2   indeed, we will be producing Jencks in advance of a witness

3   testifying, notwithstanding the fact that the law specifically

4   says you don't have to discover it until after.

5      But I don't think it is fair or accurate to say that that

6   is quibbling when we recognize we have a Rule 16 obligation and

7   we recognize any statements or evidence that is material that

8   has not been disclosed would, obviously, be subject to Rule 16

9   and possibly *Brady* if it could be exculpatory.

10      But in this case, what we are saying is we don't dispute

11   that material statements are subject to Rule 16, as the Court

12   alludes to.  But to the extent we have found some emails that

13   were subsequently produced pursuant to Jencks, where there was

14   absolutely no new information, our position is that wasn't

15   Rule 16, it was Jencks, because there was no additional

16   material information being produced.

17      Does that address the Court's concerns, or should I

18   clarify?  Is there anything else I should address?

19        THE COURT:  No, and let me explain what I am

20   referring to as reference to cases that really don't, in some

21   ways, appear to be salient to what is before the Court.

22      At page 9 of your June 19 surreply or supplemental

23   briefing, at line 14, "Neither a general description of the

24   information sought nor a conclusory allegation of materiality

25   suffice."  Then, "*Brady* does not establish a duty to provide

1    defense counsel with unlimited discovery of everything known by

2    the prosecutor."

3         That's not what Ms. Bernstein is aiming for, obviously.

4    She is aiming for discovery related to these statements, how

5    they were obtained and how they were memorialized.

6         So I think, ultimately, to the extent that there's

7    references so these cases, then it does lead Ms. Bernstein to

8    wonder, "Okay.  Are we actually having this debate, whether or

9    not these statements are discoverable?"  And so, ultimately, I

10   understand why Ms. Bernstein takes the position that she does.

11        And at this point, I am satisfied that the government has

12   taken reasonable steps to obtain discovery that the defense is

13   otherwise entitled to under Rule 16 and *Brady*.  And to the

14   extent that there is additional discovery under Jencks, you are

15   right; the defense isn't entitled to have it until after the

16   witness testifies.

17        At the same time, we also know that, as a custom and

18   practice and as a practical matter, those statements are

19   provided in advance of the hearing so that we can avoid the

20   waste of time.

21        So, in any event, Ms. Bernstein, would you wish to be

22   heard further?

23             MS. BERNSTEIN:  I think that is it, Your Honor.

24        I do want to just make clear, I am not alleging that there

25   has been any violation of any rules or any misconduct.  It is

1   just because of the ongoing production of discovery and because

2   I kept asking very direct questions about what was left and did

3   not receive any direct responses, I just wanted to clarify.

4   And my concern was that I wasn't getting answers.

5        So if the government's response is "None of this exists,"

6   then none of it exists.  I am not accusing them of anything.  I

7   just wanted to be clear, because I know they inquired about the

8   notes back in January, and since January, I have received a lot

9   of discovery related to this motion.  So I just wanted to be

10  clear if, in the process of finding more relevant discovery,

11  that nothing else came up.  If nothing else came up, then

12  that's valid.  But I am not accusing anyone of anything.

13            THE COURT:  All right.  So, at this point, then, I

14  will confirm my tentative with respect to the request for those

15  three categories of discovery.

16       And then, would you like to be heard further on the other

17  two matters, Ms. Bernstein?

18            MS. BERNSTEIN:  Yes, Your Honor.

19       Well, as for the matter -- the rest of the information

20  coming about the confidential discovery, we did ask the

21  government for a lot of additional information, and the

22  government agreed to inquire of the FBI, obtain that, and go

23  through whatever procedures are necessary to redact or provide

24  to the Court *in camera* and then produce to us, so I don't think

25  that that is in dispute at all.  I think that will just take

1    some time, but there's no dispute there.

2         So I can address the protective order.

3              THE COURT:  Let's do this.  Let's determine when

4    should we reconvene to address this additional discovery?

5         In the government's papers, they noted that, because of

6    COVID-19 manpower issues, it would take at least two weeks to

7    obtain these materials, and then one would expect it would take

8    them a couple of days or so to review it and then prepare some

9    form of *ex parte* motion, to the extent that *in camera* is

10   appropriate.

11        So, given all of that, should we set the matter in four to

12   six weeks?

13             MS. FEVE:  Your Honor, I can provide the Court with

14   an update if that would help figuring out timing.

15             THE COURT:  Yes.

16             MS. FEVE:  At 12:30 today, we received by email two

17   of the witness statements the defense have expressed an

18   interest in viewing, as well as the two agent statements and

19   one additional document prepared by an agent's counsel.  We

20   still need to review them.

21        I think we are going to have some of the issues we had

22   before.  Because there was a merging of the FBI investigation

23   into activity and conduct involving Agent Chabalko, and they

24   didn't do a separate investigation with regard to Agent Reed.

25        And so, part of why we have that commingling issue is just

1    because there's a bunch of information that is extremely
2    sensitive, and it only relates to Agent Reed and does not
3    relate to Agent Chabalko.  So I suspect we are going to have to
4    submit some materials for *in camera* review, and we will do it
5    as diligently and as quickly as we can and will certainly get
6    them to the Court next week, once we have had the opportunity
7    to review them.
8        With regard to the video recording that the defense has
9    requested, we learned late yesterday that it has to be mailed.
10   That's not something that we can have emailed to us.  We are
11   hoping it will get to the FBI in San Diego sometime next week,
12   at which point they will transfer it over to us.
13       What I can tell is you I don't know that we anticipate
14   having issues with the video recording.  I think we will have
15   to review it, but I am not anticipating at this time that
16   there's going to be a need to take proactive and prophylactic
17   steps with regard to the recording the same way there is with
18   the documents.
19       So our hope is that we can get materials to the Court next
20   week, and that, at the latest, they will be to the defense
21   approximately a week and a half from that.
22       And with regard to the recording, I will certainly let
23   Ms. Bernstein know when we have received it and give her an
24   estimate of when we expect to be able to turn it around.  But
25   we are hoping to be able to have it next week.

```
 1              THE COURT:  Okay.  So, then, that would set us up for

 2   being able to follow up on all of this in three or four weeks.

 3        Do you agree, Ms. Feve?

 4              MS. FEVE:  I do.  And to the extent that it's

 5   helpful, I know we already have a hearing set for the 17th.  I

 6   don't know if we want to have this set for an off-calendar day,

 7   because it only pertains to Mr. Qayyum --

 8              THE COURT:  I think we should.

 9              MS. FEVE:  -- but it certainly sounds reasonable.

10              THE COURT:  Let's make it in four weeks.  July 14.

11              MS. FEVE:  Would August 7 be acceptable to the Court?

12              THE COURT:  I don't know if I want to bump it that

13   long.

14              MS. FEVE:  I am happy to do it earlier.  I misread

15   your pause.

16              THE COURT:  No, I was just looking at my calendar and

17   then I was trying to think this through.

18        To the extent that we have a hearing on matters relating

19   to other defendants on the 17th, it might be a good idea to

20   have it on a week other than the 17th, is what I was thinking,

21   so that I am not -- if not distracted, I am not divided in

22   terms of what I am working on, both the big-ticket items

23   relating to the other defendants and then this matter, which is

24   also important, but will require time to get ready for.

25        So, let's set it for July 24th at, again, 2:30, and we can
```

1    proceed telephonically for that hearing as well.  And

2    hopefully, by that time, we will be able to then be in a

3    position to schedule an evidentiary hearing in this matter on

4    the motion to suppress statements.

5        So then, moving on to the third area of discussion -- that

6    is, the protective order -- Ms. Bernstein?

7            MS. BERNSTEIN:  Thank you, Your Honor.

8        I think that there's -- I can kind of cover this in two

9    separate issues.  There's the issue of the redactions that are

10   in the discovery, and then there's the issue of the scope of

11   the protective order.

12       You know, I am at a severe disadvantage to argue this

13   because I don't know what I am arguing about.  I don't know

14   what was there.  I don't know the justification for the FBI

15   redactions.  I understand the Court's logic behind endorsing

16   the government's additional requested redactions, but it is

17   difficult to argue against something we haven't seen.

18       I think all I would say is that the Court will get an

19   opportunity to review the FBI's redactions, and I understand

20   those are being produced to the government, but the request

21   would be that that be either wholesale produced to us or at

22   least wholesale produced to the Court so the Court can make the

23   determination.

24       In terms of the other redactions that the government

25   requested and the Court found did not pertain to the misconduct

1   that was found, I guess, you know, the only response I can

2   provide, not knowing what is underneath the yellow

3   highlighting, is that it doesn't appear disconnected from

4   describing the conduct that was under review.  It is in the

5   middle of sentences.  Sentences just drop off and suddenly are

6   redacted.

7        And the FBI did include this in their investigation, in

8   their reports.  So I don't think -- I don't think the FBI

9   concluded that it was segregable and separate because it is

10  part of the sentences that make up the underlying

11  investigation, the offense conduct -- not "offense conduct,"

12  but incident conduct.

13       In terms of those redactions, you know, if the Court has a

14  real concern about them -- and I understand the Court also

15  saying that you don't see any use for them and so we wouldn't

16  be able to ask questions about them; you don't see how it would

17  aid an investigation.  And again, I can't respond to that

18  because I don't know what is there.

19       I would ask if the Court would reconsider those redactions

20  for now and make them attorneys' eyes only, because that seems

21  to strike a better balance between protecting sensitive

22  information and the disclosure necessary for effective

23  preparation.  And once they were attorneys' eyes only, if we

24  were able to make a more fulsome argument about why the Court

25  should reconsider those, we could make those at the time.  But

1    that's, I think, the least what I would ask about the yellow

2    redactions we were provided.

3            THE COURT:  Let me ask the government.  Do you take a

4    position with respect to those highlighted remarks, statements,

5    information?

6            MS. FEVE:  I am sorry, Your Honor.  Are we referring

7    to the yellow highlighted portion --

8            THE COURT:  Yes.  Yes.

9            MS. FEVE:  -- or the black highlighted portion?

10           THE COURT:  No, the yellow.

11           MS. FEVE:  Your Honor, the yellow highlighted

12   sections, our position is under no set -- no matter how

13   expansive you view the rules of discovery, that there is no

14   legal argument for why the very, very limited portions that

15   were redacted in yellow are at all discoverable.  None of them

16   could ever be used to impeach the agent, who is prepared to

17   testify.  The only thing that they could be used for is to

18   harass or try to embarrass him because of something that

19   happened to him, not something that he did.

20       And I appreciate the frustration Ms. Bernstein must be

21   experiencing as a determined advocate, and so to the extent

22   that it is helpful context, one of the reasons we are dealing

23   with this situation is the bureau, for whatever reason, chose

24   to commingle its inquiry into the behavior of Agent Chabalko

25   with the behavior of Agent Reed.

1    We have offered to have the associate division counsel, at

2    the FBI, who has had an opportunity to review all of the

3    unredacted materials, testify and speak to the Court *in camera*

4    should the Court have any questions about those redacted

5    materials.

6    But with regard to the yellow redactions, there's nothing

7    in there that relates in any way, shape, or form to any

8    misconduct undertaken by Agent Chabalko, and the only thing

9    that would happen by disclosing that information would be to

10   embarrass him and put him in a very awkward position that is

11   completely beyond the bounds of what the law calls for.

12   MS. BERNSTEIN:  While I appreciate Ms. Feve's lack of

13   belief in my ability to not use evidence to embarrass an agent

14   but instead use it to advocate for a client, who is being

15   charged with felonies that have immigration consequences by the

16   government, if I can -- and I don't know if this proceeding is

17   under seal, but I would like to just read two sentences, and I

18   can illustrate for the Court why it is not believable to me

19   that this is segregable.  They are highlights that are in the

20   middle of two sentences, so if I can -- I can either direct the

21   parties' attention to where this occurs -- it is on pages 5 and

22   6 of the report -- or we can seal this portion of the

23   transcript, and I can read them into the record.

24   But it is not believable that the half-lines that are

25   redacted are segregable from the conduct that the rest of the

1    sentence and paragraph is describing.

2             THE COURT:  And I think the problem is the standard

3    you are applying is whether or not they can be segregated.  And

4    I guess the answer is that yes, it can be segregated, to the

5    extent that the subject matter does not relate to the specific

6    charges, to the specific actions that produced or resulted in

7    the discipline against the agent.  And that, to the extent that

8    there's a recitation of facts that are chronological and some

9    of those facts end up not relating to the charges, are not

10   referenced in the charges or in the conclusions that resulted

11   in the discipline, and in fact, as pointed out by Ms. Feve, are

12   things that would be embarrassing and could be used to either

13   humiliate or harass the agent.

14        And ultimately -- keeping in mind that the Court would not

15   be prepared to allow these allegations to be the basis of any

16   cross-examination or any examination, period.  And so, the fact

17   that they are part of this recitation of facts, in the Court's

18   view, does not mean that they cannot be severed, because they

19   can, and for the reasons that I have stated.

20        So, at this point, I am prepared to confirm my approval of

21   the redaction of those highlighted materials, and this will be

22   saved for appellate purposes.  And if the Ninth Circuit has an

23   opportunity to review this at some point, and if they disagree

24   with me, then I take the chance that I made this mistake for

25   naught.  But this is my ruling, and I am comfortable making it.

```
1            MS. BERNSTEIN:  Okay.  Thank you, Your Honor.

2       Maybe at the end of the hearing, so that it's easier for

3  purposes of the transcript, if I can just add the sentences.

4  There's three highlights that are, I think, at issue.  One of

5  them I am not taking issue with, but the other two I am.  So

6  maybe just for completion of the record, at the end of the

7  hearing, if I can just add those sentences in, and that portion

8  can be sealed, so if this does get later reviewed, there is no

9  ambiguity.

10       The second issue with the protective order is the scope of

11  it.  It's unduly restrictive and prevents our ability from

12  really preparing for this trial and preparing a meaningful

13  defense for Mr. Qayyum.  The order does not allow us to share

14  any documents with witnesses.  It doesn't allow us -- or any

15  information, not just documents.  I don't know that we would

16  have a great need to share these documents.  But it doesn't

17  allow us to share the documents or their contents with any

18  witnesses, with any investigators.  And that alone prevents us

19  from being able to really meaningfully prepared for the

20  hearing.

21       And I think what is very important to understand is that

22  this isn't just general impeachment.  We filed the motion to

23  suppress on May 15, with Mr. Qayyum's sworn declaration of what

24  occurred and the issues that have come out in this confidential

25  discovery bear directly not only on the agent's credibility but
```

```
 1    also on Mr. Qayyum's version of what happened.  He described

 2    events similar to what was investigated and found by OPR.  So

 3    we do want -- we need the ability to be able to investigate

 4    this material further.

 5        I appreciate the government making the video and making

 6    the other information available to us.  But we need to be able

 7    to ask people questions about this and work with an

 8    investigator, and the order absolutely precludes us from being

 9    able to do that.

10        And in terms of sharing it with the rest of the defense

11    team --

12            THE COURT:  Let me back up for a moment because

13    there's a lot to unpack there.

14        So, one of the categories of individuals that you are

15    referencing is investigators; is that right?  Are you asserting

16    that this language does not allow you to hire investigators or

17    have investigators review this?

18            MS. BERNSTEIN:  Yes, it does.  We may not disclose

19    the documents or the contents of the documents to anyone, other

20    than our own staff.

21            THE COURT:  It says, "Nothing contained in this order

22    shall prevent the disclosure of the confidential materials to

23    any attorneys, secretaries, law clerks, paralegals, or any

24    other person who is working for the United States or counsel of

25    record for Qayyum in the investigation or preparation of this
```

1  case."

2      I would interpret that language as permitting the defense

3  to have a person who is working with you in the investigation

4  of the case to review it.

5      Do you agree with that, Ms. Feve, or do you dispute that?

6              MS. FEVE:  No, I agree with that, Your Honor.

7              THE COURT:  So, as a starting point, then,

8  Ms. Bernstein, I believe you have that right, to have your

9  investigators review this and consider it and take it into

10  account and work with it in their investigation.

11              MS. BERNSTEIN:  And how does that work in terms of

12  the ability to question witnesses about this information?  Are

13  witnesses also -- other witnesses collectively referred to in

14  this instance?

15              THE COURT:  I think -- and I am not sure if you are

16  referring to witnesses for the underlying conduct that produced

17  this discipline.  Is that who you are referring to?

18              MS. BERNSTEIN:  That's who I can anticipate in the

19  moment.

20      I mean, what I have been able to glean from this is a

21  potentially disturbing pattern of conduct that was similar in

22  time.  So, if we wanted to ask any of the witnesses that are

23  mentioned in the confidential record about this, I believe this

24  protective order would preclude us from doing so.  If it

25  doesn't, then I don't have an objection on that ground.

```
1              THE COURT:  As a starting point, certainly, I would

2    view this language as permitting your investigators to go out

3    and contact the individuals that are referenced in the reports

4    and talk to them and ask them what happened.  One would think

5    that would be 90, 95 percent of what you would want.

6         To the extent they maybe forgot something and you wanted

7    to refresh their memory with these confidential materials, then

8    let me ask the government, what would your position be in that

9    scenario?

10             MS. FEVE:  Your Honor, I think that the issue there

11   would be, if this makes it easier -- right now they don't have

12   the witness statements yet.  But what we could do, when we

13   submit the witnesses' statements, to the extent that they are

14   considered protective materials, we can make it clear that if

15   we need to show the 302 memorializing the interview with

16   Witness A to refresh Witness A's recollection, that that would

17   be covered by the protective order.

18        But I think the concern is showing other documents that

19   have other sensitive information that the witness could then

20   learn about and see.  And I think there's a bunch of reasons

21   why that would not be the best practice.

22        But if the concern is simply about being able to refresh

23   recollection with this particular 302, that is something that

24   is very discrete and should be easy to address.

25             THE COURT:  All right.  So, Ms. Bernstein, I think
```

1    you would be entitled to reach out to the witnesses, to

2    interview them and, to the extent that it's necessary, refresh

3    their memory of their prior statements.

4        Do you believe that you should have the right to go

5    further?

6            MS. BERNSTEIN:  As for the witnesses, I just would

7    note that a lot of what is described as, "Person A said that

8    they saw someone else doing something."  And there's a lot of

9    people that are in this environment at once.  I just don't want

10   to -- I want to be very respectful of the order in place.

11   That's why I did not read the investigator to be in the

12   category of people called "assistants."  I just wanted to be

13   very careful.

14       If I am asking Person A, and Person A doesn't remember

15   something, and I say, "Well, Person B said that X, Y, Z," I

16   want to be sure --

17           THE COURT:  Ms. Bernstein, this is all testament to

18   your character and your fidelity to the law, so I appreciate

19   that.

20       I don't see a problem with the investigators.  I don't see

21   any problem that we can't address with respect to the

22   witnesses.

23       Are there other categories of individuals that you think

24   you should be entitled to share this information with?

25           MS. BERNSTEIN:  The only other category, Your Honor,

1    is the codefendant and the defense team.  And I think the Court

2    knows part of the reason I don't find it to be applicable -- or

3    that there's -- made a showing that there's a need to share

4    with the codefendants, one of the things the Court said is

5    that, from the posture, it doesn't appear that they have

6    similarly situated statements.

7         My understanding is, in fact, that Agent Chabalko has

8    interviewed at least one other of the defendants.  And in terms

9    of whether this particular -- Mr. Qayyum's statement can be

10   used against the other defendant, there's a conspiracy charge,

11   and I have no doubt that the government will be interested,

12   should they prevail on being able to use the statement, to try

13   and use it against the other defendants as a coconspirator

14   statement.

15        And the other is this is the case agent.  This isn't an

16   ancillary person in this investigation.  This is a case that's

17   been investigated going back at least four or five years, and

18   this was the person who was running the investigation.

19        This isn't misconduct that occurred long before.  This is

20   misconduct that occurred just before the bringing of the

21   indictment, and the investigation and statements related to

22   this are continued throughout the beginning of this case.

23        So I think we are going to -- I think it is inevitable

24   that this discovery comes out to the other defendants, and it

25   doesn't seem that the government disputes that this is relevant

1    impeachment material.  It seems to me like maybe the government

2    is going to try to not have to disclose this by not calling

3    their agent, but I don't know that that carries the issue if we

4    call the agents.

5         And we will most certainly will be calling the case agent,

6    number one, if we don't prevail on this motion and we are

7    having to argue voluntariness to the jury.  And then, also, we

8    would probably be calling the case agent to potentially impeach

9    other witnesses that the case agent interviewed.  So the case

10   agent will be a witness in this trial, and it seems inevitable

11   that this discovery comes out.

12        It seems inevitable that this statement of Mr. Qayyum, if

13   it is allowed in, is attempted to use against the other

14   codefendants, and that we should not be able to work with the

15   rest of the defense team to -- the whole team of the defense is

16   a little bit difficult and limiting, and it prejudices

17   Mr. Qayyum.

18        There's case law, and I think that we have cited it to the

19   Court previously, that protective orders should be no broader

20   than necessary to accomplish the proper goals of the protective

21   order.  And that the Court needs to consider how burdensome the

22   protective order would be on a defendant, being sensitive to

23   the extent to which a protective order hinders their ability to

24   defend themselves.

25        I think both of those are from *U.S. v. Smith*.

1    Here, I believe that we have the right to confer with

2    defense counsel, and I believe that not being able to confer

3    with defense counsel about the discovery that pertains to the

4    case agent, who has brought a five-year case against the

5    client, deprives Mr. Qayyum of full and competent

6    representation.

7    And that it could be the same protective order could be in

8    place and could be modified to attorneys' eyes only, but there

9    are ways to deal with this.

10    It seems like it is a matter of timing.  The issues that

11    are typically present to justify a protective order -- such as

12    the safety of witnesses, danger of perjury, or witness

13    intimidation, issues of national security, or business

14    enterprise, economic reprisals -- are not present here.  So

15    it's hard to see the good cause that the government has to

16    prevent this discovery from being shared with the rest of the

17    defense team, particularly in light of the way that hinders

18    Mr. Qayyum's ability to defend the case.

19         THE COURT:  Ms. Feve, would you like to respond?

20         MS. FEVE:  Yes, Your Honor.

21    As the Court remembers from, I believe, prior

22    conversations, it is not our intention to call Agent Chabalko

23    in our case in chief.  And we have said that before, and that's

24    still our position.

25    When we understood that he was going to have to testify

 1    because of the defense motions, that's when we undertook our

 2    *Henthorn* and our *Giglio* review.

 3            THE COURT:  Let me ask you something.  With respect

 4    to Mr. Qayyum's statement, you are not intending to offer it in

 5    your case in chief, is that right, either through the agent or

 6    through the coagent -- is it Peterson?

 7            MS. FEVE:  That's correct, Your Honor.  That's why we

 8    want to litigate the voluntariness.  If he gets on the stand,

 9    we want to be able to cross-examine him.  And being mindful, we

10    have no idea what case the defendants will put on, and so we

11    can't foreclose what we will do and who we will call if we had

12    to put on a rebuttal case.

13        But for now, our plan, and the way we have planned out the

14    trial tentatively -- and it is tentative because there are

15    several moving pieces, including what charges we are going to

16    trial on, what evidence will be available to us.  But we have

17    told this to the Court before and we have stood behind it.  And

18    when Agent Chabalko came into play, that's why we went out on

19    our own to do our due diligence.

20        With regard to the defense counsel's proffer that the

21    defense intends to call Agent Chabalko, that's their right.

22    So, to the extent they choose to do so, we will obviously honor

23    our discovery obligations as that arises.  But I believe that

24    that potential plan -- which, of course, they don't have to

25    tell us what case they are going to put on; they don't have to

1    tell us if they are going to put on a case at all -- but we

2    need to anticipate that they are going to do that without them

3    telling us anything, makes it somewhat speculative, because, if

4    I correctly understood defense counsel, what she was saying is

5    she intends to call Agent Chabalko to impeach other witnesses

6    and then we want to impeach him ourselves.  And I don't know

7    quite how it works to have him impeach other witnesses when you

8    are also impeaching him.

9         And it could be that that's why, for now, for the actual

10   case in controversy before you -- which is should the Court

11   grant the motion to suppress Mr. Qayyum's statements and

12   thereby preclude us from using them in our case in chief and

13   should the Court find they are involuntary, precluding us in

14   using them on cross-examination -- for those purposes, the only

15   person with standing, as far as we are aware, is Mr. Qayyum,

16   and that's why we produced them to him.

17        I am unaware of witness interviews with any of the

18   statements conducted by Agent Chabalko.  It could be I don't

19   know about them or I may have forgotten about them, and defense

20   counsel can direct our attention to them; we can go back and

21   see if that changes our understanding of the discovery

22   obligations.

23        But for now, the only party we have ever heard say

24   anything about bringing a motion to suppress, because the only

25   statements that were ever elicited other than potentially in

1    terms of the proffer, were the ones here at issue.

2              MS. BERNSTEIN:  Your Honor, and I can be a little bit

3    more clear about -- if Mr. Qayyum's statement is found to be

4    anything other than voluntary, we will be challenging that

5    before the jury, and we will be calling Agent Chabalko.

6              THE COURT:  But -- wait.

7         But the government is saying that they are not going to

8    call any witness to testify regarding your client's statement.

9    So the only way that the statement would come in would be in

10   the event that your client takes the stand, and then, during

11   cross-examination, he would be subject to cross-examination

12   with this statement, to the extent that it's voluntary.

13   Correct?  Is that how you see it?

14             MS. BERNSTEIN:  I think that that's -- yes.  I

15   understand what the Court is saying.

16        I am sorry; I didn't know if that was directed at me.

17        I do understand that that is what the Court is saying.

18        But I think that is more speculative of a theory than I am

19   otherwise able to provide.  If this statement is not precluded

20   as involuntary, I think there's a very strong, if not certain,

21   likelihood that Agent Chabalko becomes a witness.

22        But I also think that we are a little bit down the hole,

23   in that when we come back up, the issue of the protective order

24   is whether there's good cause for the restrictions in place and

25   whether the protective order is the least restrictive as

1    possible but accomplishing whatever that good cause is.

2         And, here, a protective order that does not allow

3    Mr. Qayyum to confer with co-counsel about possible impeachment

4    and issues regarding the case agent of an investigation that's

5    been going on for years limits his ability to prepare for this

6    hearing, limits his ability to prepare his trial defense, and

7    there doesn't appear to be good cause for that.  There also

8    doesn't appear -- there appear to be other ways of

9    accomplishing that.

10        We are not asking for the protective order to go away.  We

11   are not asking to be able to share this with the public at

12   large, who probably, frankly, have a real right to know about

13   this information, but that's not the request.  The request is

14   to be able to defend my client, to defend this motion, and to

15   be able to prepare a defense.

16        And I am not clear what the good cause is for the order,

17   as written, that would preclude the rest of the defendants from

18   having this information.

19            THE COURT:  Ms. Feve, one of the arguments made by

20   Ms. Bernstein was that, in the event that her client testifies,

21   that the government's introduction of the statement would

22   necessarily implicate codefendants, and so, that, in that way,

23   it would impact codefendants in such a way they should at this

24   point be allowed to review this information.

25        What is your response to that?

1          MS. FEVE:  Your Honor, I think there are a few things

2     we would need to know, which is first -- and all of it,

3     recognizing we don't even have a trial date and still don't

4     know exactly what charges we are going to trial on.

5          But the defense are going to make their decisions,

6     assuming we do get a trial date and the case is not dismissed,

7     whether or not they think there are potential jury issues or

8     whether there's any motion for severance.  Unless and until we

9     know that, it seems to me this is somewhat premature.

10         I am not suggesting they should make that motion.  I am

11    not suggesting that it's even warranted.  But recognizing this

12    is a case where there's been a lot of litigation, I recognize

13    there is a potential issue that will arise.

14         And so, to the extent that the notion is if Mr. Qayyum

15    testifies and the government has the opportunity to

16    cross-examine him as the witness -- again, we are not -- if we

17    are doing cross-examination; we are not calling him as our own

18    witness; we are just asking him questions about his own prior

19    statements -- I don't see how what happened at a bar with Agent

20    Chabalko changes the fact, provided the Court makes a

21    voluntariness determination that permits the Court to inquire

22    about the statement.

23         MS. BERNSTEIN:  And, Your Honor, I find -- I mean,

24    there are allegations that, during the interview of my client,

25    he was threatened and coerced, in part, with the flashing of a

1    service weapon and that type of psychological intimidation.

2    And that is 100 percent substantiated by conduct that was

3    independently investigated and found months later.  So it is

4    not a reach to suggest that that, in fact, happened.

5        So whether the Court believes that happened or not and

6    whether the Court precludes the statement as involuntary or

7    not, he does have a 100 percent right, without even making a

8    stretch, to argue to a jury that that, in fact, might have been

9    what happened and my client was coerced when he made this

10   statement.

11       And while it's true that we don't have a trial date or

12   don't know the viability of the wire fraud count, we know we

13   are going to trial on CAN-SPAM counts, and the statement bears

14   directly on the CAN-SPAM counts.  I don't even know that it

15   would be applicable to the wire fraud counts.

16       So I think the suggestion that we just not deal with this

17   and we wait until what?  Until at trial, when Mr. Qayyum

18   testifies, and then we take however long a break cocounsel

19   needs, to be able to investigate this pertaining to their own

20   clients?

21       This discovery seems inevitable to come out, and I don't

22   see there's been either a showing of good cause for the

23   restriction in place to prevent other codefendants of knowing

24   about the personnel files of the case agent, who is a potential

25   defense witness in this case.

THE COURT:  All right.  Well, at this point,
certainly, this discovery -- well, you are and your client is
entitled to this discovery, and you have made an adequate
showing given its relationship to the motion to suppress
statements.  At this point, it is not clear to the Court that
this *Henthorn* impeachment information is discoverable by the
codefendants, where at this point the government has announced
that it does not intend to call the witness in its case in
chief.

The argument that the codefendants would be entitled to it
once your client testifies and then the government ends up
introducing the statement, the Court can craft an order that
the Court can determine or decide what parts of the statement
should be introduced so that we don't have that problem, be it
under *Bruton* or under 403.

So, I am not satisfied that, in the event that your client
testifies, that that automatically will create a set of
circumstances which will result in the need for this
impeachment.

On the theory that Agent Chabalko is a case agent who has
been involved for a significant period of time, at this point,
I don't see where that status by itself permits the production
of *Henthorn* material.

So I am going to confirm my earlier tentative ruling, that
the codefendants are not entitled to have access or receive

1    this information.

2           MS. BERNSTEIN:  And, Your Honor, does that also mean

3    that this evidentiary hearing is going to be sealed?

4           THE COURT:  It may mean that there's certain portions

5    relating to it.  To the extent that the government calls the

6    witness and Agent Chabalko testifies as to how it was he came

7    about interviewing your client, sat down with him, and actions

8    related to that, that should be open.

9       To the extent that there's cross-examination relating to

10   inconsistencies or as to the failure to prepare notes or the

11   destruction of notes, that should be open.

12      But to the extent that there's cross-examination that

13   zeros in on this discipline, then, yes, the Court would

14   entertain a motion to close the proceedings.

15          MS. BERNSTEIN:  Okay.  Thank you.

16      I appreciate the Court's consideration and the time.  We,

17   of course, disagree with the outcome but do understand and will

18   respect it.

19          THE COURT:  All right.

20          MS. BERNSTEIN:  And I just want an opportunity

21   towards the end if we can seal the record so I can add in the

22   two sentences.

23          THE COURT:  Yes.

24          MS. BERNSTEIN:  I don't think it will make a

25   difference, but I have had cases reversed on less.

1          THE COURT:  Let's do that now, Ms. Bernstein.

2          MS. BERNSTEIN:  Okay.  Thank you, Your Honor.  So

3    just circling -- I assume this portion is now under seal?

4          THE COURT:  Yes.  I will ordered it sealed.







17      THE COURT:  At this time, is there anything else to

18  address, Ms. Bernstein?

19      MS. BERNSTEIN:  The only final thing I would note is

20  that it was discussed we will be back before the Court on

21  July 17th.  I believe the hearing was July 16th.

22      THE COURT:  I said July 24, didn't I?

23      MS. BERNSTEIN:  July 24 for this matter.

24      MS. FEVE:  I misspoke.  I referred to the hearing

25  date as the 16th.

1          THE COURT:  Oh, yes, it is.  We have the matter on

2   calendar for July 16 at 2:00 p.m.

3          MS. BERNSTEIN:  Yes.  And we understand we will

4   continue this hearing as to the discovery, is that the scope of

5   the next hearing on the 24th, is that to address the additional

6   discovery related to this confidential discovery and the time

7   for an evidentiary hearing?

8          THE COURT:  Yes.

9          MS. BERNSTEIN:  Thank you.

10          THE COURT:  Mr. Qayyum, you are still on the line?

11          THE DEFENDANT:  Yes, I am still on the line.

12          THE COURT:  So, then, I will direct you to take steps

13   to be present telephonically and participate in the upcoming

14   hearings, both on July 16, 2020, at 2:00 p.m., and July 24, at

15   2:30 p.m.  Do you understand, sir?

16          THE DEFENDANT:  Yes, Your Honor.  I will.  I

17   understand.

18          THE COURT:  Anything else from the government?

19          MS. FEVE:  No, Your Honor.  Thank you.

20          THE COURT:  And I think the Court has already found

21   excludable time, at least through July 16, and the Court at

22   this time will find excludable time through the 24th, as we are

23   dealing with discovery issues in addition to the COVID-19

24   challenges that have been addressed by the Chief Judge orders.

25      So, that will be all.  Have a great weekend and be safe

1    and take care.

2             MS. BERNSTEIN:  Thank you, Your Honor.

3             MS. FEVE:  Thank you, Your Honor.

4        (End of proceedings at 3:45 p.m.)

5                          -o0o-

6                C-E-R-T-I-F-I-C-A-T-I-O-N

7

8             I hereby certify that I am a duly appointed,

9    qualified and acting official Court Reporter for the United

10   States District Court; that the foregoing is a true and correct

11   transcript of the proceedings had in the aforementioned cause;

12   that said transcript is a true and correct transcription of my

13   stenographic notes; and that the format used herein complies

14   with rules and requirements of the United States Judicial

15   Conference.

16             DATED:  July 10, 2020, at San Diego, California.

17

18                       /s/  Chari L. Bowery

19                       _____
                         Chari L. Bowery
20                       CSR No. 9944, RPR, CRR

21

22

23

24

25