Thomas H. Bienert, Jr., SBN 135311
James D. Riddet, SBN 39826
Whitney Z. Bernstein, SBN 304917
Carlos A. Nevarez, SBN 324407
**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile  (949) 369-3701
Email: tbienert@bienertkatzman.com
        jriddet@ bienertkatzman.com
        wbernstein@ bienertkatzman.com
        cnevarez@bklwlaw.com

*Attorneys for Mohammed Abdul Qayyum*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>MOHAMMED ABDUL QAYYUM,<br><br>        Defendant. | Case No. 3:18-CR-04683-GPC-3<br>Hon. Gonzalo P. Curiel<br><br>**SENTENCING MEMORANDUM ON BEHALF OF MOHAMMED ABDUL QAYYUM**<br><br>Sentencing Date:   October 3, 2022<br>Sentencing Time:   10:30 a.m.<br>Location:          Dept. 2D |

# **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................1

II.     MOHAMMED ABDUL QAYYUM.................................................................1

        A.      Challenging Move to the United States to Pursue a Better Life ....................1

        B.      Eventually Finding Community at His Job.................................................3

        C.      Stable and Fulfilling Career ..........................................................................4

        D.      The Offense ....................................................................................................6

III.    SENTENCING RECOMMENDATION.........................................................8

        A.      The Parties Agree that a Time Served Sentence is Appropriate...................8

        B.      The Monthly Fine Amount Should Be No More Than $100.........................8

        C.      The Guidelines Support a Time Served Sentence.......................................11

        D.      The § 3553(a) Factors Supported a Time Served Sentence .........................11

IV.     CONCLUSION.................................................................................................12

## I.    INTRODUCTION

After years of litigation by both sides, Mohammed Abdul Qayyum and the government entered into a plea agreement (Dkt. 484) and agree as to all material aspects of the recommended sentence.  The parties, and Probation Department, agree that this Court should not impose any custodial sentence and should require Abdul to complete 100 hours of community service.  Per the plea agreement, entered into before the parties had the benefit of the Probation Department having confirmed Abdul's negative $165,000 net worth (PSR ¶ 63) and negative monthly cash flow (PSR ¶¶ 63, 64), the parties also agree that the Court should impose the statutory maximum $100,000 fine and determine the monthly payment.  In light of his verified extreme debts, and to not set him up to violate the Court's order, Abdul respectfully requests that the Court order any fine payable at a monthly rate of no more than $100 and waive interest under 18 U.S.C. 3612(f)(3)(A).  While Abdul has been on supervision without incident for four years and no further supervision is needed, Abdul does not object to a term of supervised release for the Court to retain jurisdiction and regularly revisit Abdul's ability to pay a higher monthly amount toward any fine.

## II.    MOHAMMED ABDUL QAYYUM

Mohammed Abdul Qayyum is a hardworking and trusting husband, father, and employee whose lack of judgment in this case is a stark aberration to an otherwise positive, rule following life.  For the past four years, Abdul has lived under this indictment and the concomitant uncertainty and immeasurable stress about his and his family's future and ability to remain in the United States.  His success on pretrial supervision for four years reaffirms the anomaly of his role in a criminal offense, his ability to move on from this case and resume a productive life, and his respect for the law.  Abdul fully accepts responsibility and is eager to put this entire chapter behind him and move forward.

### A.    Challenging Move to the United States to Pursue a Better Life

Abdul was born in Hyderabad, India, as the sixth child and first son to his parents.  Abdul's childhood was pleasant and unremarkable.  Though his childhood home lacked running water and he shared a room with all of his siblings, he always had enough food and

a roof over his head. He grew up speaking Hindi. While it was difficult to get an education in his hometown, especially for his five sisters, Abdul's father placed a premium on school. He saw education as the only path to broaden one's world and obtain a good living, and he instilled this appreciation and respect in Abdul. Abdul attended 15 years of primary education in India, specializing in computer science, a field he thought would open doors for him and provide a secure livelihood and bright future.

After obtaining his college equivalent degree in computers from a school in India, Abdul got a job working in technical services at a call center. He wanted to progress in his career and was told that he could be promoted with a master's degree from the United States. Abdul had never been outside of his hometown in India and was both excited and nervous at the prospect. After speaking further to colleagues, he learned of an 18-month-long master's program in information systems management from Coleman College in San Diego (a private university that closed in 2018 due to accreditation and financial problems[1]). He began a long application process and applied for a visa. The night before the interview with the consulate, feeling as though he was on the precipice of realizing a dream, he recalls being so nervous that he stayed up most of the night rearranging all his piles of papers. In the morning, he was so excited and on edge that even after all his careful and diligent preparation, he forgot a critical document in his hotel room.



Nonetheless, his visa was approved and after a whirlwind of leaving his job, packing up his sparse belongings, saying goodbye to Shalu, his girlfriend (now wife and mother to their one-year-old son), and parents and siblings, Abdul found himself at San Diego International Airport. He was 28 years old, and thousands of miles away from anyone and anything he knew, speaking broken English, struggling to understand English, and very much a

---

[1] *See* San Diego Union Tribune, *San Diego's Coleman University closing after 55 years* (Jul. 30, 2018), *available at* https://www.sandiegouniontribune.com/news/education/sd-me-coleman-closing-20180730-story.html (last accessed Sept. 24, 2022).

MOHAMMED ABDUL QAYYUM'S SENTENCING MEMORANDUM

foreigner in a strange land.  Though he feels foolish and sheltered admitting it now, at the time, Abdul's only image of the United States was the Hollywood version of New York City, and upon landing in San Diego, he was shocked, confused, and wondering if he'd made a huge mistake leaving his entire world behind.

Abdul was picked up by a chaperone of his master's program and taken to the student housing.  He quickly learned that San Diego was decidedly not the hustle and bustle and packed, overflowing community of New York City.  He was lonely and isolated, without a car, knowing no one, and struggling to assimilate.  His limited and formal English made it difficult to authentically communicate and explain himself and his nuanced personality, the time zone change and his lack of financial assets made it hard to stay connected to his family at home, and it was a very difficult transition.

## B. Eventually Finding Community at His Job

Though his master's program was intense, Abdul was used to working long hours at a fulltime job.  He longed to fill his days and distract himself from the loneliness and despair that threatened to creep in.  He also needed money to offset the daily debt he was accruing, having had to take out personal loans, with extortionary interest rates, to pay his tuition, room and board, and daily expenses, as he was not eligible for government regulated student loans on his immigrant visa.  Abdul began applying for jobs.  Given his education and experience, he was certain he'd be employed in no time.  But Abdul's confidence was misplaced, and his self-esteem continued to crumble as the weeks stretched on and he continued to hear nothing in response to the dozens of applications he submitted.

Eventually, in response to an ad he saw on Craigslist, Abdul was invited to interview and ultimately hired on as systems technology intern for Frontline Direct (later Adconion Direct, later Amobee, *see* PSR ¶ 60), a role that aligned exactly with his graduate studies. He was excited to utilize what he was studying and learn the real-world application of his field.  At the time, it was a small, closeknit company, with around 20 total employees. Coming off a hard and lonely transition to the U.S., Abdul was extremely grateful for the

opportunity to work and felt honored to have been chosen to join the team, which soon came to feel like a family and provided him with a much-needed community.

### C.   Stable and Fulfilling Career

As an intern, Abdul worked closely with Kim Reed Perell, the company's charismatic, impressive, accomplished CEO,[2] who became a mentor and friend. Abdul found Kim to be honest, ethical, smart, and passionate. He still recalls that at the end of his internship, he invited Kim to his master's program graduation. Kim knew that Abdul had come to enjoy his time in San Diego and would have liked to stay but that his visa would soon end and that he was eager to return to Shalu who was still in India. So, Kim created a permanent, full-time position for Abdul at the company and offered to sponsor not only his work visa but also papers for Shalu to join him in San Diego. Abdul gladly accepted this great opportunity. While life in San Diego was very expensive, Abdul's yearly salary of $75,000 helped him to afford housing and daily expenses for him and Shalu and send money home to his family in India.

For the next 14 years, Abdul worked for Kim as the company grew exponentially through various acquisitions and mergers. This was the only job Abdul ever had in the United States and the only work family he'd ever known. He enjoyed and trusted his coworkers, and remained constantly impressed by Kim's leadership, energy, and success. As he had done his whole life, he deferred entirely to his coworkers as to issues and topics that he understood to be in their fields, stayed in his lane, did not question them, and was honored by their trust in him and his expertise when they asked him to handle more technical tasks of the business.

---

[2] *See, e.g.*, https://money.cnn.com/2016/08/19/news/economy/kim-perell-amobee/index.html ("[Kim] remembers going door to door collecting cans and redeeming them at five cents a piece for spending money. When she wanted to learn horseback riding she cleaned the stables. When she wanted a car at 16, she flipped pizzas and sold suits to buy one. . . Eventually she started two of her own companies. Now, at age 39, she is president of a multi-million dollar digital marketing firm in San Diego called Amobee."); https://en.wikipedia.org/wiki/Kim_Perell (listing more than 15 significant awards), (last accessed Sept. 24, 2022).

Abdul had strong working relationships with his coworkers and superiors, and was friendly and considered them to be close, but rarely socialized with them outside of work. When asked why he did not have a more robust relationship with his coworkers outside of the office, and if such a relationship might have enabled candid conversations about each person's view of what was happening at work such that the offense may have been avoided, Abdul explains that he and Shalu keep to themselves, do not socialize much, and lead a very quiet home life, similar to how they were raised in India, where family was the only relationship.  Over the years, Abdul and Shalu have been working on growing their community and have redoubled efforts since welcoming their son last year so he can grow up with many loving adults around despite being far from family in India.

In 2011, Abdul became the "Technical Operations Manager."  The promotion was in title only as Abdul's responsibilities and role did not change, he did not manage anyone, and he continued to receive a $75,000 yearly salary.  Still, Abdul was very proud of the title and recognition of his contributions to the company.  He was also proud of the work the company was doing, handling email marketing for established, well-known companies such as Disney, Groupon, Olive Garden, Subway, GIECO, Match.com, Fidelity, and USAA.  He fondly recalls taking Shalu on a date using one email marketing campaign the company ran for Olive Garden with a "buy one get one free" special.  With his new title, Abdul continued to earn a $75,000 yearly salary for 2012, earned slightly more income for 2013 ($82,500 yearly salary), and still slightly more for 2014 ($89,100 yearly salary).  To be clear, Abdul was proud to be a valued member of the team, be able to work in his chosen field, and to earn a respectable income.  But he did not achieve considerable wealth at this job, especially as compared to the millions of dollars Kim and other executives amassed.  *See, e.g.*, https://kimperell.com/about/, last accessed Sept. 24, 2022 (Kim "bec[ame] a multi-millionaire by the time she was 30, and s[old] her last company Amobee, [*sic*] for $235 million"); *Angel Investor Kim Perell Flipping Miami Beach Manse with Rare Floating Helipad, available at* https://www.dirt.com/gallery/moguls/power-players/kim-perell-house-miami-beach-helipad-1203427405/, last accessed Sept. 23, 2022 (describing Kim's

$26.9 million Miami Beach property home and 2021 sales of "at least two oceanfront properties in the San Diego [], a 2,700-square foot home in Solana Beach that went for $6.1 million and a nearly 6,300-square-foot residence on a high ocean-front bluff in Carlsbad that traded at exactly $10 million . . .").  In stark contrast, during the years of the offense conduct, from 2011 to 2014, Abdul's ***total gross income for four years was under $325,000***, and he lived in a small rental apartment in Oceanside.  During those years, and since then, Abdul's debts and daily expenses have continued to outpace his income.  He still does not own property, and currently resides in a slightly larger rental in Oceanside. *See* PSR ¶ 64 (verifying Abdul's "negative net worth and negative monthly cash flow" and noting that "it appears [Abdul] is unable to pay a fine").

### D.   The Offense

Abdul fully accepts responsibility for his actions.  After four years of litigation, days of trial, and pleas, the Court is familiar with the background, players, and offense.  In short, and as relevant here, between 2011 and 2014, Daniel Dye, who pled guilty in 18-CR-00822-GPC and is awaiting sentencing, sold the netblocks at issue to the company, at which point Abdul was tasked with, and did, configure email accounts to allow his employer to use the netblocks in the names of individuals listed on the American Registry of Internet Number's directory, which were then used and controlled by his coworkers, and coordinated his employer's connectivity and use of these IP addresses intending for them to be used for the employer's clients' email marketing campaigns, though the employer was not the registrant or legitimate successor in interest of these netblocks.  *See* Dkt. 464 at 4-5, ¶¶ 2, 5.

Abdul has no justification for his actions, and never intended to risk the life he's created in the United States for his wife and young son through years of blood, sweat, and tears over 11 netblocks, for which he received no monetary compensation or profit.  He is dismayed that despite years of hard work building a career and good name, the headline of his tenure and his enduring reputation and record have been reduced to a mere 11 netblocks, a tiny fraction of the work he performed throughout his 14-year career with the company. Abdul appreciates that the things that comforted him between 2011 and 2014—his blind

faith and trust in his coworkers, in Kim (the person Abdul revered who initiated and blessed the relationship with Daniel Dye) and in the company and its stellar reputation and impressive client roster—do not justify or absolve him of his involvement in criminal conduct.  From the first interrogation by the FBI in 2016, through the indictment in 2018, through his upcoming sentencing in 2022, Abdul has had to live with his staggering disappointment and shame, and crippling fear and uncertainty, for his involvement in this.  Those who know him know both how deeply he regrets his lack of judgment here and that he can and will improve for himself, his family, and his son and provide a positive life free of criminal justice involvement forevermore.  *See* Exhibit A, Letter from Brian Baumgart.



Abdul wants to make things right.  He pled guilty and accepted responsibility for his actions.  That there was litigation over the legal and technical aspects of this prosecution of first impression should not detract from Abdul's acceptance of responsibility, and indeed, he has agreed to waive his right to appeal all of the issues he would otherwise appeal in this prosecution of first impression.  As any alleged victim was able to "recoup any prior loss"—in fact, some of the netblock registrants, once alerted by the FBI about its investigation, either donated their legacy IP addresses or sold them for significant profit—there has never been any "loss" by any alleged victim to rectify; indeed, in many instances, the alleged victims experienced notable gain.  *See* PSR ¶ 20.  Though restitution is thus unavailable, Abdul is nonetheless willing to spend 100 hours away from his wife, young son, and new job to give back to and make amends with the San Diego community that has given so much to him.  He hopes to complete these hours through volunteer work with Feeding San Diego, an organization he has always admired.

As Abdul's actions since 2014 have shown, he can and will move on from this to again lead a positive, contributing life.  While being laid off by Amobee in July 2022 and the following soul-crushing, finance-straining job search brought back all the familiar

feelings of insecurity and inadequacy that he felt when he first came to this country, like he did then, Abdul preserved and obtained new employment and a fresh start. He will never again find himself involved in the criminal justice system.

## III.   SENTENCING RECOMMENDATION

As this Court knows, it has considerable discretion in choosing an appropriate sentencing for Abdul. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

### A.   The Parties Agree that a Time Served Sentence is Appropriate

The parties agree that Abdul should receive a time served sentence and imposition of community service from this Court. Further supervision beyond the past ***four years*** that Abdul has been on pretrial supervision is unnecessary to achieve deterrence, public protection, or offender rehabilitation. *See, e.g.*, *United States v. Sales*, 476 F.3d 732, 735 (9th Cir. 2007). However, if the Court desires, Abdul has no objection to a term of supervised release for the Court to retain jurisdiction and regularly revisit Abdul's ability to pay a higher monthly amount toward any fine.

### B.   The Monthly Fine Amount Should Be No More Than $100

Per the plea agreement entered before the parties had the benefit of Abdul's verified negative $165,000 net worth (PSR ¶¶ 63, 64)) and negative monthly cash flow (*id*.), the parties also agree that the Court should impose the statutory maximum fine of $100,000. This should be imposed at a monthly rate of no more than $100, commensurate with Abdul's liabilities. Further, under 18 U.S.C. § 3612(f)(3)(A), this Court should waive interest. A higher monthly amount or permitting interest to accrue would effectively impose a more severe sentence than is just or necessary and set Abdul up to violate the Court's order.

Abdul has an overwhelming amount of debt, more than $165,000, *see* PSR ¶ 63, initially accrued during his graduate studies and exacerbated by interest and the cost of life

outpacing his modest salary.  Because he funded his graduate studies and early life in the U.S. with personal loans, there is no loan forgiveness program available to him.  Still, he has worked hard to consolidate debt and adhere to payment plans, and he makes monthly payments, albeit small, toward the various balances each month to do what he can to reduce these liabilities.  But recently, his financial picture got worse.  With the birth of his son last year, his wife left the workforce.  She now lacks work authorization to legally seek employment, and in any event, is unlikely to earn more income than the cost of daycare. Abdul acutely feels the pressure of being the sole provider for his family and the simultaneous responsibility of remaining calm and reassuring exacerbate that pressure. Being laid off from his job this summer and unemployed for six weeks while he looked for a new one forced Abdul to shift expenses to credit and also exacerbated his financial situation.   While he owns a motorcycle free and clear whose Blue Blook value is approximately $13,000, Abdul has been trying to sell it for months and has not received any viable offer.  Even the dealership told him they wouldn't pay more than a few thousand dollars at most for it.  If and when it comes to that, Abdul is willing to accept a low offer to get money in his pocket, but he is hoping to find a buyer willing to pay what he thinks the bike is worth.

In the PSR, Probation recognized that, based on Abdul's "negative net worth and negative monthly cash flow, it appears that [Abdul] is unable to pay a fine."  PSR ¶ 64. While this is true, per the plea agreement, Abdul agreed to join in the government's request of the Court that he pay $100,000, the statutory maximum.  Despite his inability to pay a fine, Probation suggested that Abdul utilize "some assets" and "look at other ways in which his household could increase its income (e.g. increase his income and/or the number of wage-earners in the household) or reduce its expenses."  PSR ¶ 64.  To be very clear, Abdul is not complaining about and is proud of his lot in life, but he explains the below so the Court has context for why Probation's suggestions and recommended $500 per month fine payment are impossible.

Regarding selling his assets, Abdul is attempting to sell his motorcycle and has looked into selling his cars and getting different vehicles.  However, Abdul does not have much equity in the cars, and given the current market, if he sold them and paid off the principal and interest on each loan, he would not be able to afford repurchasing vehicles and would then have a higher added expense of transportation costs via rentals, car shares, etc.  As he no longer has the employer-sponsored life insurance policy (*see* Dkt. 500 at 1), or any other asset (PSR ¶ 63), Abdul has no other assets to utilize for a fine.  Regarding the suggestion that Abdul "increase his income" (PSR ¶ 64), though he very much desires to do so, he has been unable.  After being laid off from Amobee, and saddled with this criminal conviction, Abdul applied to approximately 200 jobs before finally getting his current position, at the identical salary he was earning at Amobee.  Abdul is uniquely well positioned to say that he has tried and failed to "increase his income." *Id*.  Finally, regarding the suggestion that he increase "the number of wage-earners in the household" (*id*.), currently there is no legal way to do this.  Abdul's wife does not have work authorization.  While they have applied to adjust their statuses, the applications are still pending and likely to be slowed down if not denied due to Abdul's conviction in this criminal case.

Thus, Abdul respectfully requests that the Court fashion the imposition of the fine and monthly payments considering Abdul's verified negative net worth and negative monthly cash flow.  While no more than $100 per month may not seem like much, it represents an extreme amount to Abdul and his family, who live paycheck to paycheck and do not see their way out of crushing debt.  A monthly payment of any amount will require Abdul to literally reassign monthly income away from his young son and to stop paying and trying to get on top of his other crushing debt for decades to come.  But he understands this is a consequence of his involvement in this offense, and will figure out how to support his family, as he always has.  Given the realities of his finances, Abdul asks the Court to impose no more than $100 per month and waive interest under 18 U.S.C. § 3612(f)(3)(A).  Anything else merely sets Abdul up to fail.  As discussed, Abdul has no objection if the

MOHAMMED ABDUL QAYYUM'S SENTENCING MEMORANDUM

Court imposes a term of supervised release to continue to monitor Abdul's ability to increase his monthly payments.

### C.    The Guidelines Support a Time Served Sentence

The parties agree as to the Guidelines calculations:

| | |
|---|---|
| Base Offense Level [18 U.S.C. § 1037(a)(5); U.S.S.G § 2B1.1(a)(2)] | 6 |
| Specific Offense Characteristics [$9,700 "loss;" § 2B1.1(b)(1)(B)] | +2 |
| Acceptance of Responsibility [U.S.S.G. § 3E1.1(a)] | -2 |
| Total Offense Level | 6 |
| Criminal History Category | I |
| Guideline Range | 0-6 months |

The parties also agree that the Court should impose the low-end, time served (per Dkt. 496, PSR, at 2 "release status," credit for one day in custody when fingerprinted, released, and placed on pretrial supervision the same day) .

### D.    The § 3553(a) Factors Supported a Time Served Sentence

The requested sentence is appropriate given Abdul's overwhelmingly positive history and characteristics and the indisputably unaggravated nature and circumstances of this offense.  Time served, supervised release if the Court deems it necessary, 100 community service hours, and imposition of a fine at a monthly rate of no more than $100, accounting for Abdul's negative net worth and negative monthly cash flow, would also promote respect for the law and provide just punishment.  Promoting respect for the law means meting out a commensurate punishment.  As the Supreme Court has recognized, an overly harsh sentence "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *Gall*, 552 U.S. at 54 (citations omitted).  Abdul's case epitomizes a situation where imposing an overly harsh sentence would run counter to the goals of promoting respect for the law.  Abdul, who spent most of his life romanticizing the United States and its opportunities and equities, has been marred in the legal system for years and has already pled guilty for his lapse in judgment.  He is now

branded as a convicted criminal, and his future, and that of his family's, in this country is in jeopardy.  The instant offense is an isolated, regrettable lack of judgment in an otherwise law-abiding, rule-following existence.

Regarding deterrence, there are two types of deterrence for the Court to consider— general deterrence, i.e., deterrence of others, and specific deterrence, i.e., deterrence of Abdul.  As to general deterrence, studies have found that it is the fact of a sentence, not the severity of it, that has a deterrent impact.[3]  As to specific deterrence, a custodial sentence or a fine payment greater than $100 per month would be counterproductive.  Abdul should be encouraged to work, provide for his family, continue getting on top of his debts, and give back to and make amends with the community through community service.  The reality is that Abdul's conviction in this case, four years of supervision, eight years of uncertainty from the time of the FBI's interrogation to now, and the collateral consequences this conviction may have on his and his family's ability to remain in and adjust to becoming citizens of this country are themselves very significant and real consequences.  *See, e.g.*, Exhibit B, Letter from Shalu ("It has been more than five years and we have struggled through tensions and uncertainty while the immigration process is still in process for both me and Abdul.").  Abdul will never reoffend.

## IV.    CONCLUSION

Abdul is immensely remorseful for his conduct and involvement in this offense.  For all of the reasons stated above, Abdul respectfully requests a sentence of time served; a term of supervised release if desired by the Court wherein the Court continues to monitor his ability to pay a higher monthly payment toward any fine; 100 hours of community service; and, per the plea agreement, the statutory maximum $100,000 fine, with interest waived under 18

---

[3] *See*, *e.g.*, Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623, 653 (2005), summarized at https://www.ojp.gov/ncjrs/virtual-library/abstracts/missing-link-general-deterrence-research; Andrew Von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summarized at https://www.ojp.gov/ncjrs/virtual-library/abstracts/criminal-deterrence-and-sentence-severity-analysis-recent-research.

MOHAMMED ABDUL QAYYUM'S SENTENCING MEMORANDUM

U.S.C. § 3612(f)(3)(A), payable at a monthly rate of no more than $100 commensurate with his verified negative net worth and negative monthly cash flow (*see* PSR ¶ 64).

Respectfully submitted,

Dated:  September 26, 2022

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**

By:  */s/ Whitney Z. Bernstein*
    Thomas H. Bienert, Jr.
    James D. Riddet
    Whitney Z. Bernstein
    Carlos A. Nevarez
    *Attorneys for Mohammed Abdul Qayyum*

MOHAMMED ABDUL QAYYUM'S SENTENCING MEMORANDUM

## CERTIFICATE OF SERVICE

Counsel for Defendant Mohammed Abdul Qayyum certifies that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

David W. Wiechert
Jessica C. Munk
William J. Migler
*Attorneys For Jacob Bychak*

Gary S. Lincenberg
Nicole Rodriguez Van Dyk
Darren L. Patrick
Alexis A. Wiseley
*Attorneys For Petr Pacas*

Randy K. Jones
Daniel J. Goodrich (Pro Hac)
Ryan Dougherty (Pro Hac)
*Attorneys For Mark Manoogian*

AUSA Melanie K. Pierson
AUSA Sabrina L. Fève
AUSA Ashley E. Goff
U.S. Attorney's Office

Candina S. Heath
U.S. Department of Justice

*/s/ Whitney Z. Bernstein*
Whitney Z. Bernstein